FLORENCE MCALLISTER, Administratrix of Estate of WILLIAM MC-
ALLISTER, v. ST. LOUIS MERCHANTS BRIDGE TERMINAL RAILWAY
COMPANY, Appellant.—25 S. W. (2d) 791.

Division One, March 5, 1930.

1006

*J. L. Howell* and *R. E. Blodgett* for appellant.

*Abbott, Fauntleroy, Cullen & Edwards* and *Charles P. Noell* for respondent.

LINDSAY, C.—Upon the original hearing of this cause on appeal, the judgment rendered in favor of respondent was affirmed, in accordance with an opinion prepared and filed by the Presiding Judge of this Division. Later, appellant's motion for a rehearing was sustained, and the cause was again submitted upon the original briefs, and upon a supplemental brief filed on behalf of respondent.

The vital question in the case, and the question uppermost in mind in granting a rehearing, was that of whether a submissible case was made in the showing of a causal connection between the existence of a defective car coupler, and the death of respondent's husband. A further consideration of the record and of the questions raised, and particularly the question especially under consideration in granting the rehearing, has led to the conclusion that the right result was reached under the original submission.

The issues, the evidence, the effect of the authorities cited by appellant, and the conclusion reached thereon are admirably set forth in the original opinion. Except for some brief additional statements relative to the question of proof of causal connection between the defective coupler and the death of respondent's husband, nothing can be added to the original opinion. The statements therein contained and herein adopted are as follows:

"Plaintiff sued for damages resulting from fatal injuries alleged to have been received by her husband, William McAllister. The action was brought under the Federal Employers' Liability Act and Safety Appliance Act against several defendants, but dismissed as to all except appellant, St. Louis Merchants Bridge Terminal Railway Company. The deceased was employed as a switchman at the time his mortal injuries were received and plaintiff's specifications of negligence were as follows:

" '(1) By reason of the carelessness and negligence of the defendants in hauling and using in the said train on their lines two freight cars on which the coupling apparatus on such cars were out of repair, old, worn and defective, and the drawbars, couplers, knuckles, knuckle locks and pins of which were old, worn and defective, so that they were likely to become uncoupled and allow the train to part, and by reason thereof the train did come apart as they were switching same, causing two cars to roll down a track and run upon and over William McAllister, killing him instantly, in violation of the laws of the United States and of the Safety Appliance Act of March 2, 1893 (27 Statutes at Large 531, Chap. 196), as amended by Act of March 2, 1903 (32 Statutes at Large 943, Chap. 976).

" '(2) The said two cars were being used and hauled on their lines by the defendants, common carriers by railroad engaged in interstate commerce, and were being used in connection with engines, tenders and cars used in moving interstate commerce, and were not

equipped with couplers coupling automatically by impact, in viola-
tion of the laws of the United States and of the Safety Appliance
Act of March 2, 1893 (27 Statutes at Large 531, Chap. 196), as
amended by Act of March 2, 1903 (32 Statutes at Large 943, Chap.
976), but were equipped with couplers which were not in workable
and usable condition, in that while used in the aforesaid train which
was being moved and switched at Madison, Illinois, the couplers
of the said cars came apart, causing cars to run over William Mc-
Allister, who was killed instantly.

" '(3) The agents and servants on said train, while doing the
switching, moved the said cars by their engine violently and roughly,
in that they moved the train of cars with great violence and then
stopped the train of cars suddenly, causing the aforesaid two cars
to separate from the train and roll away from the train of cars
onto William McAllister, killing him instantly.'

"Defendant's answer consisted of a general denial and a plea of
assumption of risk. Plaintiff's reply was a general denial.

"At the close of plaintiff's evidence defendant asked an instruc-
tion in the nature of a demurrer to the evidence, which was denied,
and defendant thereupon announced that it would not introduce
any further evidence. The trial resulted in a verdict and judgment
for plaintiff, from which defendant appealed. Appellant here con-
tends that the trial court erred in refusing to give its requested in-
struction in the nature of a demurrer to the evidence, and in giving
instruction numbered one requested by plaintiff.

"In the course of the trial it was admitted by counsel for plain-
tiff and counsel for defendant that the deceased was engaged in
interstate commerce, that he was in the employ of defendant St.
Louis Merchants Bridge Terminal Railway Company at the time
of his death, and that defendant was a common carrier by rail.

" 'On the above assignments of negligence plaintiff's evidence
showed that deceased was a member of a night switching crew con-
sisting of four men, namely, Will H. Lotz, foreman, Allen W. Bell,
head man on the crew, Albert Henerfauth, and William McAllister,
the deceased; that the foreman's duties were to stand at the divid-
ing switch and give signals, the head man's duties were to note all
cars and cut them in accordance with a switching card or 'racket,'
copy of which was supplied to each member of the crew, as they
came down the lead track, by lifting pins on the sides of the cars
which disengaged them from the train, and it was the duty of the
other two members of the crew to line the switches; that on Sep-
tember 27, 1922, the day deceased was fatally injured, this switch-
ing crew went on duty at three o'clock in the afternoon and the
members were in the performance of their several duties at Madison,
Illinois, about 7:45 P. M., after dark, when the injuries complained
of occurred; that they were then engaged in switching a train con-

sisting of twenty-three cars, the switch tracks being numbered from 11 to 36, and their general direction being north and south; that the first car went on track 6, McAllister lining the switch; the next car went on track 12, Henerfauth lining the switch, and it was while switching the next car on to track 21 that McAllister was injured; that when the time came to switch this car to track 21 McAllister presumably threw the switch, and started east to throw the switch for track 32, which was situated about twelve car-lengths away and for which the next two cars were intended; the foreman was standing at his usual place at the dividing switch and gave the sign to kick the car into switch 21; the head man of the crew lifted the pin on the west side of the car as the train moved southward, the engine being at the north end of the train with its pilot headed south, all members of the crew working on the west side of the train except McAllister; that immediately on the 'rebound' of the train after this car was cut loose and the train stopped the next two cars broke loose from the train and began to follow about two feet behind the car cut loose for switch track 21, which ran slightly downgrade toward the south; that all three cars were loaded and that travelling down an incline two loaded cars would travel faster than one; that as these two cars broke off and followed the one into track 21 the foreman signaled with his lantern from his position at the dividing switch to McAllister to ride these two cars and check them in order to prevent property damage; that at the time this signal was given McAllister was about twelve yards east of the dividing switch, and just after the signal was given and as the three cars were entering switch track 21 due west of him he was seen to start walking toward the two cars that he had been signaled to ride; that McAllister was not again seen until after the three cars had passed down switch track 21 when his body was found about ten car-lengths or 400 feet farther south on switch track 21, lying on the right side facing south between the east rail of track 21 and the west rail of track 22, with the head over the east rail of track 21 and partly severed; that in these switching operations McAllister was lining the switches southeast of the dividing switch, and Henerfauth those southwest; that just after the cars entered switch 21 Henerfauth was coming back facing northeast from lining switch 14 and noticed the three cars as they were running about seven or eight car-lengths down switch track 21, but did not observe McAllister or his lantern; that the cars were found about ten car-lengths farther down track 21 from the place where McAllister's body was found; that the coupler on the two cars that broke loose from the train was broken; that the train was not handled roughly at the time these cars broke loose, or at any time that night; that when these cars were examined immediately after the accident the brake on the

1012

south end of the northernmost car was wound tight, set and locked, and that this could only be done by some one getting on·top of the car, turning the brake, winding it up and locking it; that occasionally cars have the brakes slightly set while they are being switched; that two loaded box cars running along following another and about two feet behind it, as in this case, would overtake the one box car on track 21 in about ten car-lengths and would then roll right along with it.

"Appellant insists that the evidence does not support any of appellant's three assignments of negligence. We agree that it utterly fails to show that defendant moved the cars 'violently and roughly' or 'with great violence and then stopped the train of cars suddenly, causing the aforesaid two cars to separate from the train and roll away from the train of cars onto William McAllister,' as charged in the third assignment. The only evidence relating to the character of this movement appears in the testimony of Will H. Lotz, foreman of the switching crew, where he said that the train was not handled roughly at the time these two cars broke loose or at any time that evening.

"Having thus disposed of the third assignment of negligence, we turn to plaintiff's first and second assignments which grow out of an alleged violation of the Safety Appliance Act of March 2, 1893 (27 U. S. Statutes at Large 531), as amended by Act·of March 2, 1903 (32 U. S. Statutes at Large 943). The pertinent provision is Section 2 of the first act which is as follows:

"'On and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.'

"This section was amended by the above mentioned Act of 1903 which extended all of the original provisions of the statute to 'all trains, locomotives, tenders, cars and similar vehicles used on any railroad engaged in interstate commerce,' so that if a carrier by rail is engaged in interstate commerce, then the Safety Appliance Act and all its provisions and amendments apply to all cars on its line.

"While the Federal Employers' Liability Act predicates a recovery in all cases upon defects in whole or in part due to the carrier's negligence, no evidence of negligence is required where the cause of the injury is alleged to be a violation of the Safety Appliance Act. The Federal Employers' Liability Act clearly recognizes that rights of action may arise out of a violation of the Safety Appliance Act, and a disregard of the command of the statute is a wrongful act and the right to recover damages from the party in default is implied. The two statutes are *in pari materia* and the

clause in the Federal Employers' Liability Act 'due to its negligence' must be construed to mean that Congress intended to treat a violation of the Safety Appliance Act as negligence *per se*. [Roberts, Federal Liability of Carriers, sec. 783; San Antonio & A. P. Co. v. Wagner, 241 U. S. 476; Texas & P. Railroad Co. v. Rigsby, 241 U. S. 33; Seaboard Air Line Railroad Co. v. Horton, 233 U. S. 492.] The carrier's duty under the foregoing section is not discharged by the mere installation of the couplers described. It is also bound to maintain them in an operative condition. This duty is absolute and use of cars and diligence in discovering and repairing defects is no defense. [Carter v. Railroad Co., 307 Mo. 595, l. c. 605; Southern Railroad Co. v. Carson, 194 U. S. 136; Delk v. St. Louis & S. F. Railroad Co., 220 U. S. 580; St. Louis & S. F. Railroad Co. v. Conarty, 238 U. S. 243; Philadelphia & R. Ry. Co. v. Eisenhart, 280 Fed. 271.] A car coupler may be defective within this section, without being actually broken or containing a visible defect. [Chicago I. & L. Ry. Co. v. Stierwalt, 153 N. E. 807.] Nor is it any defense that the car was moved by defendant without knowledge of defects. [United States v. Southern Pac. Co., 154 Fed. 897.] Failure of a coupler to work at any time sustains a charge of negligence. [Atlantic City Railroad Co. v. Parker, 242 U. S. 56; Chicago etc. Railroad Co. v. Brown, 229 U. S. 317; Chicago, etc. Railroad Co. v. United States, 220 U. S. 559; St. Louis etc. Railroad Co. v. Taylor, 210 U. S. 281.] In Philadelphia & R. Ry. Co. v. Eisenhart, 280 Fed. 271, l. c. 275, it was held that the case was properly submitted and the verdict should be sustained on the inference of defendant's negligence to be drawn from the mere opening of the couplers, citing M. & St. L. Railroad Co. v. Gotschall, 244 U. S. 66. In the latter case the jury, under an instruction of the court, was permitted to infer negligence on the part of the company from the mere fact that the train separated because of the opening of a coupler on one of the cars. On appeal the objection was made that since there was no other evidence of negligence on the part of the company the instruction was erroneous 'as from whatever point looked at it was but an application of the principle designated as *res ipsa loquitur*, a doctrine the unsoundness of which, it is said, plainly results from the decision in Patton v. Texas & Pac. Ry. Co., 179 U. S. 658, and Looney v. Metropolitan Railroad Co., 200 U. S. 480.' Replying in the opinion to this objection Chief Justice WHITE said: 'We think the contention is without merit, because, conceding in the fullest measure the correctness of the ruling announced in the case relied upon to the effect that negligence may not be inferred from the mere happening of an accident except under the most exceptional circumstances, we are of opinion such principle is here not controlling in view of the positive duty imposed by the statute upon the railroad

1014

to furnish safe appliances for the coupling of cars. [St. Louis, Iron Mountain & Southern Ry. Co. v. Taylor, 210 U. S. 281, 294, 295; Chicago, Burlington & Quincy Ry. Co. v. United States, 220 U. S. 559; Delk v. St. Louis & San Francisco Railroad Co., 220 U. S. 580, 586; Texas & Pacific Ry. Co. v. Rigsby, 241 U. S. 33, 43.]'

"Plaintiff's first assignment is that defendants were careless and negligent 'in hauling and using in the said train on their lines two freight cars on which the coupling apparatus on such cars were out of repair, old, worn and defective, and the drawbars, couplers, knuckles, knuckle locks, and pins of which were old, worn and defective, so that they were likely to become uncoupled and allow the train to part, and by reason thereof the train did come apart as they were switching same, causing two cars to roll down a track and run upon and over William McAllister,' etc. Her second assignment is that said cars 'were not equipped with couplers coupling automatically by impact . . . but were coupled with couplers which were not in workable and usable condition, in that while used in the aforesaid train . . . the couplers on said cars came apart, causing cars to run over William McAllister,' etc. Both assignments rest upon an alleged violation of the Safety Appliance Act. The undisputed evidence was that these two cars unexpectedly separated from the train to which they were attached during the previous switching movements and a broken coupler was discovered thereon. If the coupler was defective and broke, permitting the two cars to become disengaged from the train, then defendant, under the foregoing authorities, violated the Safety Appliance Act and such violation was negligence *per se*. The issue of negligence submitted and upon which the jury was instructed was whether or not 'the coupler of one of the cars mentioned in the evidence was defective and broke and that deceased, as a direct result of the breaking of said coupler, was run over and killed.' We think there was sufficient evidence to support the submission of this assignment of negligence.

"Appellant also contends that the evidence shows no causal connection between the alleged violation of the Safety Appliance Act and William McAllister's death; that 'there was no evidence as to how he received his injuries resulting in his death.' We do not believe these contentions are sustained by the record. The evidence shows that just as the three cars were entering switch 21, William McAllister was about twelve yards due east of this end of the switch walking toward switch 32 which was about twelve car-lengths east of switch 21, presumably for the purpose of throwing switch 32, preparatory to receiving the two cars in question which were intended therefor according to the switch card, copy of which he had. If McAllister did not observe and understand the lantern signal given him by the foreman just as the cars were entering switch 21

to mount and check the speed of the two cars in question, he would not have turned back and walked toward these two cars, but would have continued to walk east in the direction of switch 32. The only reasonable inference that can be drawn from the evidence is that he turned toward the two moving cars in response to the foreman's lantern signal fully aware that the first car was destined for track switch 21, that the next two cars which were intended for switch 32 had broken loose from the train, and that he was expected to mount the latter and check their speed. He would naturally attempt to do this promptly and the act of mounting would have been accomplished before the cars had moved 400 feet further south where his body was subsequently found. Furthermore, the tightened and locked condition of the brake at the south end of the northernmost car, discovered immediately after the accident, indicates that he succeeded in mounting the car and undertook to apply the brake. This operation was evidently interrupted, because the cars continued to travel for a distance of about ten car-lengths south of the place where McAllister's body was found. Now Allen W. Bell, head man of the switching crew, testified that the two loaded cars would overtake the one loaded car, as he saw them travelling there that night, in about ten car-lengths, thus fixing the point where the impact, if any occurred, between the one car and the two which broke away and followed it at the very spot where McAllister's body was found. It is true this witness also testified that when, as in this case, two cars overtake one car 'they will strike, but they won't have no effect on the other car, because the other car is rolling.' However, the purpose of our inquiry is to know the effect under the evidence in this case of such a contact upon the two runaway cars which McAllister was riding. Elsewhere in his examination this witness said that the purpose of setting the brakes on these cars was to stop them and 'prevent them from colliding with other cars and doing property damage.' Foreman Lotz also testified that he gave the signal to McAllister 'to ride these two cars, check them in order to prevent damage.' Any collision of loaded freight cars that might cause property damage would be more or less violent. A reasonable inference from the foregoing train of circumstances is that the collision of the overtaking cars with the one that had gone before threw William McAllister from his position at the brake on the south end of the northernmost of the last two cars to his death beneath its wheels. The evidence points to and is consistent with this manner of death, and there is no evidence that McAllister met his death in any other way. The thread of causal connection runs from the disengagement of these two cars from the train by the defective coupler through the foregoing train of circumstances to the death of William McAllister, and is discernible from the evidence. It

will not do to say that McAllister had knowledge of the situation and assumed the risk of a collision, or that the collision was caused by his own negligence in failing to check the speed of the runaway cars in time. Neither assumption of risk nor contributory negligence may be interposed as a defense in cases under the Safety Appliance Act. [27 U. S. Stat. 531; 35 U. S. Stat. 65.] Nor does it matter that in handling these two cars he was not engaged in a coupling operation. The design of the statute is broader and its protection extends to employees of an interstate carrier engaged in the operation and the movement of cars even though they are not actually engaged in coupling cars. [Louisville & N. R. Co. v. Layton, 243 U. S. 617.] The evidence tends to show that McAllister was handling these two cars, pursuant to his foreman's order and in the discharge of his duty, and that he was thrown beneath the wheels by a collision caused by the cars released by the defective coupler. We think the evidence was sufficient to go to the jury on the question of whether or not the defective coupler was the proximate cause of his death.

"On the question of proximate cause this case is clearly distinguishable from certain cases cited by appellant, to-wit, Illinois State Trust Co. v. Mo. Pac. Railroad Co. (Mo.), 5 S. W. (2d) 368; St. Louis-San Francisco Railroad Co. v. Conarty, 238 U. S. 243; Admx. v. Railroad Co., 255 U. S. 455; and Rittenhouse v. St. Louis-San Francisco Ry. Co., 299 Mo. 199. In not one of these cases was the car with the defective appliance the one that moved and caused the collision, and hence, the defect could not be said to be the proximate cause of the collision. In the instant case, however, the movement of the defective car directly caused the collision, and the evidence also tends to show that McAllister was then engaged in handling that car. As we understand the controlling decisions the demurrer in this case was properly ruled."

On oral argument for defendant upon the second hearing it was strenuously urged that the verdict was based upon conjecture, and could have been reached only by an unwarranted "piling of inference upon inference." We hold this not to be so, because, each of the various related inferences which might reasonably be drawn, as supporting the final conclusion, has its own basis of fact to support it. The evidence warranted the conclusion that there was a collision or coming together of the two cars with the one car. They were all loaded cars. They were moving down grade. The testimony was that the two loaded cars coupled together would move faster than the single car. They were in contact when found several car-lengths beyond the place where McAllister's body was found. They necessarily came together somewhere. The testimony of the switchman, the witness Bell, was that as he saw them moving there

that night the two cars would overtake the one ahead in about ten car-lengths. This was of the nature of expert testimony as to what would probably happen under the circumstances existing. The body of McAllister was found on track 21, at a point about ten car-lengths distant from where these cars were, when the witness saw them. It does not appear that McAllister's body was dragged along the track, and he must have fallen at the point where his body was found. His head was inside the east rail of track 21, his neck was almost severed, and his body lay east of the east rail; that is to say, the evidence tended to show that the wheels of at least one of the cars ran over McAllister's body at, or about the point where he fell and where the two cars would naturally come in contact with the car ahead. The circumstances described tended to show that McAllister fell so as to be across the east rail when he was run over by the wheel. There is nothing shown which indicated that he was in a standing position, on the ground, when he fell. All of the circumstances point to the conclusion that he fell from one of the two cars, and from the front end of the rear car. The meaning and purpose of the signal given to him by the switch foreman was that he should ride the two runaway cars and check them to prevent damage. When the signal was given he was about twelve yards to the east of those cars, and he immediately began walking toward them. He could only check them by the use of the brakes, and he could only apply the brake by getting upon the cars. The foreman found the brakes set on the front end of the rear car, after the cars had come to a stop. No one else was upon or about these cars, from the time they began to run, until they were found a little later at a standstill. If McAllister set this brake, as the evidence tended to show, he necessarily did so while he was upon the car. The distance he had to go to reach these cars and the other circumstances reasonably exclude the idea that he had climbed upon the car, and set the brake, and climbed down again so as to step in front of the rear car.

The following testimony was given:

"Q. What position does he take on the car to set one of those brakes? A. Two positions; you can stand on the board there, platform, and set it that way, or you can lean over the top of the car.

"Q. How near to the end of the car is the brake? A. On the end of the car.

"Q. Right on the end? A. Yes, sir.

"Q. What position or in what direction would Mr. McAllister be thrown if the two loaded cars collided with the one loaded car coming down those tracks as he was stooping over? A. South."

If the place, and the position of the body of McAllister when he was found, be considered alone, as isolated from the other circumstances shown, the cause of his death other than the conclusion that

he had been run over by a car wheel, would be left to conjecture. But, the place where his body lay, and the position in which it lay are to be considered in connection with the other facts shown, and with the related inferences reasonably to be drawn therefrom. All of the circumstances are to be considered, and all the inferences which reasonably can be drawn from the circumstances shown in the testimony. These circumstances are related to each other, and the inferences arising from them are related, and are not so remote nor lacking in connection, that it must be said as a matter of law they do not warrant the conclusion drawn by the jury.

The other question of alleged error argued, is the giving of plaintiff's Instruction 1; and the objections made to that instruction are all embodied in the contentions made in support of the demurrer to the evidence and the same authorities are cited. As to the instruction, the claim is there was no evidence sufficient to submit the question whether McAllister was run over and killed as a direct result of the breaking of the coupler, or that the proximate cause of his death was the defective coupler.

The contention of defendant under both assignments, is two-fold in character. Under one phase of it, the insistence is made that there was no evidence that there was a collision between the two cars, and the car ahead of them, and no evidence of the position of the deceased immediately prior to the time of his death. We hold that under the evidence these matters were for the jury.

The other phase of the defendant's contention is, in effect, a claim that even if the deceased was riding one of the two cars and attempting to stop them, and there was a collision, and he was thrown onto the track, run over and killed, the breaking of the coupler was not a proximate cause of his death. This contention goes upon the theory that the breaking of the coupler had already taken place, before the deceased got upon one of the two cars, and therefore that the breaking of the coupler could not be the cause of any injury to him. This is an unsound theory under the facts in this case, and it is not supported by the authorities cited upon that phase of the question. It must be conceded that there was evidence that the breaking of the coupler was the cause of the two cars becoming detached from the rest of the train, and moving on the track after the other car. It is too plain for argument, that the cause mentioned, continued actively operative, and inhered in the movement of the two cars. The facts in this case clearly distinguish it from Illinois State Trust Co. v. Mo. Pac. Ry. Co., 5 S. W. (2d) 368. In that case there was a defective coupler. The cars were separated, and while they were standing on the track the deceased went between the rails in an attempt to remedy the defect in the coupler. While so engaged, the other car, which had been detached from the car upon which

deceased was at work, and removed a short distance away on the same track, for some reason not explained, rolled back down the track against the car at which the deceased was at work, and he was crushed by the impact between the two cars and killed. The defect in the coupler had no actual or direct connection with the movement of the car. The defect in the coupler was merely a condition or incident whereby the deceased was at a certain place, and it had nothing to do with the condition which caused the other car to run down upon the car at which the deceased was at work. In St. Louis-San Francisco Ry. v. Conarty, 238 U. S. 243, the deceased was standing on the foot-board at the front of a switch engine, which, in its movement, collided with a loaded freight car standing on the same track. The freight car had no coupler or draw-bar. It was said that if these appliances, the coupler and the draw-bar, had been in place they would have kept the engine and body of the car sufficiently apart to have prevented the injury to the deceased, but that in their absence, the engine came in immediate contact with the sill of the car. The fundamental ground of the decision that no liability was shown, was the fact that there was and could be no claim under the evidence that the collision was proximately attributable to a violation of the provisions of the Safety Appliance Act, but only that if these provisions had been complied with, injury would not have resulted to the deceased. The collision not being attributable to failure to comply with the provisions of the Act, and the deceased not being engaged in a coupling operation, there was no liability. In the instant case, according to the evidence, the movement of the two cars was directly attributable to the broken coupler, and the collision of the two cars with the one ahead was an unbroken part of the movement. Another case cited is Lang v. N. Y. Central Railroad Co., 255 U. S. 455, very similar in its facts to the Conarty case. In that case a car without draw-bar or coupler was standing on a track. The deceased, a brakeman, was riding upon another car which was kicked upon the same track. A collision occurred, and the deceased was crushed between the car on which he was riding, and the defective car. The decision followed the decision in the Conarty case. It was held that though it could be said that the deceased would not have been injured if the car collided with had been equipped with draw-bar and coupler, yet, under the circumstances, there was no liability. The basis of the decision, like that in the Conarty case, was that "the collision was not the proximate result of the defect," or, as the court put it, in another way, "the collision under the evidence cannot be attributable to a violation of the provisions of the law." Without specially referring to other cases cited under the contention now being considered, it is enough to say that none of them sustains the claim now under consideration.

Under the views expressed, it results that the judgment is affirmed. *Seddon* and *Ellison, CC.*, concur.

PER CURIAM:—The foregoing opinion by LINDSAY, C., is adopted as the opinion of the court. All of the judges concur.

PER CURIAM:—Appellant has filed a motion to transfer this cause to Court en Banc on the ground that "a Federal question is involved," citing Section 4 of the Amendment of 1890 of Article VI of the Constitution of Missouri, which is as follows:

"When the judges of a division are equally divided in opinion in a cause, or when a judge of a division dissents from the opinion therein, or when a Federal question is involved, the cause, on the application of the losing party, shall be transferred to the court for its decision; or, when a division in which a cause is pending shall so order, the cause shall be transferred to the court for its decision."

The obvious purpose of transferring a cause from a division to the Court en Banc for its decision is to obtain the judgment of the entire court on the matter presented for decision. Where the judges of a division are equally divided in opinion such transfer is necessary to reach a decision. Where one judge of a division dissents from the opinion therein the matter presented for decision when so questioned is presumably deemed to justify the consideration of the Court en Banc. Likewise, when a Federal question is involved the matter for decision is presumably deemed to be of such importance that it may be heard by the entire court. Cases arising under the Constitution of the United States, acts of Congress, or treaties, and involving their interpretation and application, and of which jurisdiction is given to the Federal courts, are commonly described by the legal profession as cases involving a "Federal question." [Black's Law Dictionary; In re Sievers, 91 Fed. 366, 372; Williams v. Bruffy, 102 U. S. 248, 20 L. Ed. 135.] If the above reference to a Federal question had occurred without synonymous or qualifying terms in Article VI of the Constitution as originally adopted, it might be given this broad interpretation. However, appearing as it does in an amendment to Article VI and adopted some fifteen years thereafter we think the words "when a federal question is involved" should be interpreted according to the standard originally indicated and still set forth in Article VI. Section 12 of that article fixes our jurisdiction, and the only Federal questions there mentioned are those "involving the construction of the Constitution of the United States," or where "the validity of a treaty or statute of or authority exercised under the United States is drawn in question." When the article was amended as above it seems reasonable

to assume that the same kind of a Federal question was meant as had previously been defined in the article and such as is in itself jurisdictional rather than merely incidental to a cause of action brought here on other jurisdictional grounds.

The only Federal question in this case grows out of the fact that the alleged cause of action rests on the Federal Employers' Liability Act. Neither the validity of the act, nor "authority exercised under the United States" is drawn in question. It follows that the motion should be and the same is hereby overruled. All concur.