F. L. BARON v. J. M. KURN and JOHN G. LONSDALE, Trustees of and for ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellants.—164 S. W. (2d) 310.

Division Two, July 28, 1942.

Rehearing Denied, September 8, 1942.

*E. G. Nahler* and *Ward & Reeves* for appellants.

*A. P. Stone, Jr.,* for respondent.

*Thomas J. Cole, W. W. Graves* and *Jacob Brown, amici curiae.*

BOHLING, C.—The main contested issues presented for determination on this review, under the facts and circumstances involved, are stated to be (1st) whether plaintiff's cause of action is barred by our five-year Statute of Limitation; and (2nd) whether the cause of action sued on ever accrued to plaintiff under the expressed provisions of the contract pleaded. Other issues embrace the giving and refusing of certain instructions. On April 30, 1940, F. L. Baron sued J. M. Kurn and John G. Lonsdale, as trustees in bankruptcy of the St. Louis-San Francisco Railway Company, a corporation (hereinafter designated Railway), for $4,860.54 damages, allegedly accruing between May 1, 1935, and April 15, 1939, charging the Railway wrongfully failed to return plaintiff to work in accord with his seniority rights at the Railway's Springfield yards under a contract known as the "Yardmen's Schedule," effective as of November 1, 1919, and revised as of April 1, 1924, between said Railway and the Brotherhood of Railway Trainmen. Plaintiff recovered a judgment of $2,595. The case reaches us upon certification, following the dissent of one of the Judges of the Springfield Court of

Appeals to the majority opinion affirming said judgment. [See Baron v. Kurn (Mo. App.), 153 S. W. (2d) 405.]

 ˙ The Railway does not question the right of individual yardmen generally to enforce the provisions of the Yardsmen's Schedule, and the issues do not embrace any discussion of the theory or theories underlying such right. Courts of this and other states have advanced, among others, the reasoning that the employee may enforce the contract as a third party for whose benefit it was made. McCoy v. St. Joseph Belt Ry. Co., 229 Mo. App. 506, 514, 77 S. W. (2d) 175, 180[2, 3]; Hall v. St. Louis-S. F. Ry. Co., 224 Mo. App. 431, 435, 28 S. W. (2d) 687, 689[3]. Consult Annotations, 95 A. L. R. 10, 41; 81 A. L. R. 1271, 1302; 2 Williston on Contracts, p. 1099, Sec. 379A. If language found in Burnetta v. Marceline Coal Co. (Div. II, 1904), 180 Mo. 241, 250, 79 S. W. 136, 139, is to be construed that an employee may not acquire rights under a labor union contract with his employer independent of his individual contract of employment, we think it out of line with the trend of modern authority and should not be longer followed in that respect.

Plaintiff's rights are dependent upon two contracts. He was employed by the Railway on December 20, 1927, as a yardman, being classified as a "helper." This contract, fixing his status as an employee, so far as shown by the record was terminable at the pleasure of either party. The other contract, said Yardmen's Schedule, contains provisions relating to the wages, conditions of service, seniority rights, suspension, discharge, et cetera of yardmen in the Railway's employ. It was offered in evidence by plaintiff, who relies upon its provisions for a recovery, particularly Articles 10 and 17. We quote:

Article 10: ". . . [Sections "(a)" and "(b)" are deemed immaterial and are omitted.]

"(c) Reduction in force. When yard forces are reduced, the men involved will be displaced in the order of their seniority. When a vacancy occurs or new runs are created, the senior men will have choice of run or vacancy.

"(d) Yardmen laid off account reduction in force will be returned to service when forces are increased in order of their seniority, provided they return to actual service within thirty (30) days from the date their services are required, unless the management has good and sufficient cause for not returning them to service in line with their seniority, in which event the committee will be informed reasons therefor. This to apply to any Yardman laid off in force reduction subsequent to October 1, 1920." [We understand the revision of April 1, 1924, was the addition of Sec. (d) to said Article 10.]

Article 17: "(a) When objections or charges are made against any yardman, they shall be put in writing and should convey a full statement of the objections or charges.

"(b) Yardmen will not be discharged, suspended or given demerit marks without just and sufficient cause. Before inflicting punishment in form of dismissal, suspension or assessing demerit marks, the proper official will hold investigation. They may be present at the investigation together with a disinterested employe of their choice. All decisions will be rendered within five days after investigation is held. In case of dismissal, suspension or demerit marks, if any yardmen thinks sentence unjust, he shall have the right within ten days to refer his case by written statement to his Superintendent. Within ten days of receipt of this notice, the case shall have a thorough investigation by a proper officer of the Company, at which investigation he may be present if he so desires, and also be represented by any disinterested employe of his choice. In case he is dissatisfied with result of investigation, he shall have the right of appeal to general officers. In case punishment, in the form of dismissal or suspension is inflicted and subsequently found to be unjust, he shall be reinstated and paid at regular rates for all time lost."

Other provisions of said Yardmen's Schedule throwing more or less light on the oral testimony bearing on the issues are set out in the margin.*

---

*Article 15: "(a) Men entering the service as yardmen shall be extra until a permanent vacancy occurs or new runs created, when the oldest extra man or men will be made regular. . . .

"(c) Seniority rights of yardmen will date from the time they enter actual service in yard or terminal, provided, extra men are given their turn off of the extra board, and if not, local committee will establish seniority for such men. . . .

"(g) No more extra yardmen will be employed than can earn a reasonable compensation. Extra men will work first in, first out. . . .

"(h) The reasonableness of the compensation for extra yardmen will be determined by the local committee of the B. of R. T. and the proper officer of the Company."

Article 22: "(b) Bulletins will be posted on bulletin board or bulletin book, and bulletin board will be kept at each yard office, upon which assigned crews and extra men shall be registered. . . .

"(d) Yardmen on leave of absence or out of service, while permanent vacancies occur or new runs have been created, will be permitted to exercise their seniority on return to service."

Article 26: "Yardmen will not be granted leave of absence for more than 90 days without permission of General Manager and General Chairman and such leave of absence must be in writing."

Article 27: "The proper officers of the Company will furnish Chairmen of the local grievance committee of the B. of R. T. correct list of names of all yardmen and age of service every ninety days, and seniority list will be posted on bulletin board or bulletin book."

Article 34: "Any yardman leaving the service of the Company will, at his request, be given a letter bearing the official stamp of the Company, stating his term of service, capacity in which employed and whether he has been discharged or left the service of his own accord. If dismissed, such letter shall state reasons therefor."

Article 35: "Proper officers of the Company will hear any reasonable complaints made by individual yardmen or authorized committee of the B. of R. T. representing same, provided due notice shall be given the Company in writing of the subject of complaint, and special appointment made of time and place same will be considered."

On account of slack business and the inability of all the yardmen to earn a living, the Railway was laying off yardmen in 1931. This was known as a "reduction in force." Plaintiff was on the extra board and was let out of service on July 27, 1931. Other yardmen, some having superior and some having inferior seniority rights to plaintiff, were also let out of service. Plaintiff thereafter was never re-employed or returned to the service of the Railway although other yardmen having less seniority rights were returned to service. He was never accorded the investigation or other rights mentioned in Article 17 of the Yardmen's Schedule.

Plaintiff testified that they kept a bulletin board at the office in the yards on which men's names were put when they were called for work; that this was a board with the time the yard engine would begin and quit work and the names of the regular crew on little cards; that as many engines as the Railway worked would have these regular men placed under those captions of starting and quitting time, "and then off to the side of the board they would have an extra list, and the extra men had also a different colored card to designate that they were extra men. The men were taken off of the top of this extra list and placed over on a regular engine as these men laid off;" that when he was laid off in July, 1931, on account of a reduction in force, he was "on the extra board" and did not have steady employment; that thereafter he kept in touch with the yards, kept track of the board to see when he would get back and notified the call boy where he might be reached; that his name had never been placed back on the board after it was taken off in 1931. In May, 1933, plaintiff noticed yardmen working of less seniority rights than he. He testified he then saw Mr. Gustin, the Railway's General Yard Master, and informed him he was available for work; that Mr. Gustin told him, in answer to inquiries, that he, Gustin, did not know why witness had not been called back to work and the Yardmen's Schedule was still in force; that Gustin suggested he see Mr. Coppage, Superintendent of the Railway's Springfield terminal; that Coppage told him Gustin handled such matters and for him to see Gustin; that he went back to Gustin, who again informed him he did not know why plaintiff had not been called back to work and he, Gustin, would see Mr. Sisson, Superintendent of the Eastern Division, and for plaintiff to come back in the afternoon; that he was unable to locate Gustin that afternoon but saw him the next morning and Gustin told him he had not had an opportunity to see Sisson; that the next time plaintiff went back Gustin had not seen Sisson but said he would; that he saw Gustin at various times after that, over a period of years, and Gustin never did tell him why he had not been returned to service or what was the matter, or that he had been discharged or that his case had been closed. Plaintiff also testified that at the time he was laid off in 1931 he was behind in his Brotherhood dues and since

then had not been a member of the union and that he never did talk to any representative of the Brotherhood of Railway Trainmen about the matter.

Mr. Coppage's and Mr. Gustin's testimony, on behalf of the Railway, was to the effect that plaintiff was notified by.letter on March 7, 1932, and, within a few days or weeks thereafter when plaintiff personally sought reinstatement, also orally that he had been discharged from service and would not be re-employed on account of unsatisfactory work. Plaintiff, however, denied ever receiving the letter and, as stated supra, denied he was orally notified he had been discharged. In so far as these controverted fact issues might bear on the merits, they stand determined by the jury in plaintiff's favor. Gustin testified that he always had a list of the men according to their seniority before him. This was in accordance with Article 22, Sec. (b) and Article 27 of the Yardmen's Schedule.

Walter B. Eckles testified that at the time plaintiff was laid off on account of a reduction in force, he was local Chairman of the Grievance Committee for the B. of R. T. at the Springfield Terminal; that as a union officer he kept close track of whether the men were laid off and called back into service according to their seniority rights under the "Yardmen's Schedule"; that he had a say in the number that the board should be reduced; that after plaintiff was laid off he was advised that plaintiff would not be re-employed; that plaintiff never did talk to him about the matter, and that plaintiff was not a member of the B. of R. T.

 The Railway's first contention is that when plaintiff testified that his name had been taken off of the board in July, 1931, and ever thereafter remained off of the board, and that he had repeatedly interceded after May, 1933, with the officers of the Railway to be returned to service without success, plaintiff's evidence established that his cause of action accrued and the relationship of master and servant had been severed more than five years prior to April 30, 1940, the date of the institution of the action, and that the defense of the five-year Statute of Limitation barred a recovery by plaintiff. [Consult Sec. 1014, R. S. 1939 (the five-year statute); Sec. 1013, R. S. 1939 (the ten-year statute); Lively v. Tabor, 341 Mo. 352, 107 S. W. (2d) 62, 111 A. L. R. 976; Parker-Washington Co. v. Dennison, 267 Mo. 199, 183 S. W. 1041; Herweck v. Rhodes, 327 Mo. 29, 34 S. W. (2d) 32; Lehner v. Roth, 211 Mo. App. 1, 227 S. W. 833, 229 S. W. 232, sustained on certification, 295 Mo. 174, 243 S. W. 91.]

Plaintiff does not controvert the applicability of the five-year limitation if his cause of action is subject to such a defense. He contends that the provisions of Article 17 were not complied with and he was not discharged; that the Railway owed him a continuous and continuing duty to return him to service in the order of his seniority;

that its failure so to do constituted repeated and continuous breaches of the Yardmen's Schedule, giving rise to separate and distinct causes of action each and every day it so failed and refused from and after May 1, 1933, to April 16, 1939, when said Yardmen's Schedule was revised, amended and changed, and, hence, that a right existed in plaintiff on April 30, 1940, the date of suit, to sue for damages resulting from the Railway's failure to return him to service in the order of his seniority between May 1, 1935, and April 15, 1939. Plaintiff relies on McGee v. St. Joseph Belt Ry. Co., 232 Mo. App. 639, 110 S. W. (2d) 389; McGee v. St. Joseph Belt Ry. Co., 235 Mo. App. 707, 133 S. W. (2d) 675; and Bradford v. Kurn, 235 Mo. App. 1282, 146 S. W. (2d) 644. Bradford v. Kurn (p. 1287 of 235 Mo. App., and p. 646[2, 3] of 146 S. W. (2d) ) follows the McGee case (235 Mo. App. 707, 133 S. W. (2d) 675) and adds naught thereto. McGee instituted two actions against the St. Joseph Belt Ry. Co. (hereinafter designated Belt Railway), for somewhat similar breaches of a somewhat similar contract between the Belt Railway and the Brotherhood.

McGee's first action, instituted on June 15, 1933, resulted in the affirmance of a $4,700 judgment against the Belt Railway (233 Mo. App. 111, 93 S. W. (2d) 1111). As stated by the court of appeals, that action was for damages occasioned McGee by the Belt Railway, in violation of its agreement with the Brotherhood of which McGee was a member, changing and altering, on October 10, 1930, the seniority list so that *McGee's name was wrongfully placed so far down that he was deprived of an opportunity to work in the order to which he was entitled,* charging that the proper maintenance of said seniority list would have entitled him to work each and every day subsequent to said October 10, 1930. [See 233 Mo. App. l. c. 113, 93 S. W. (2d) l. c. 1113; and see (second case:) 232 Mo. App. l. c. 641, 110 S. W. (2d) l. c. 390, repeated in 235 Mo. App. l. c. 710, 133 S. W. (2d) l. c. 676.] That case presented no issue with respect to McGee being divorced from the Belt Railway's service; i. e., discharged.

McGee's second action, instituted July 31, 1936, was on the same theory, but was for damages accruing between December 15, 1933, and July 31, 1936. The answer set up the recovery in the first action in bar, alleging that plaintiff had performed no service for defendant subsequent to December 15, 1933. McGee's reply charged (as does plaintiff's petition in the instant case) that the contract was a continuing one, requiring defendant to call plaintiff to work each and every day his contract of employment remained in force; that the damages recovered in the first action covered those accruing prior and not subsequent to December 15, 1933; and that the breach of the contract recovered on in the first action was not for a total breach of the contract. [232 Mo. App. l. c. 651, 110 S. W. (2d) l. c. 390; 235 Mo. App. l. c. 711, 133 S. W. (2d) l. c. 676.] Cast nisi on defendant's

motion for judgment on the pleadings, McGee appealed. The court of appeals reversed the judgment and remanded the cause (232 Mo. App. 639, 110 S. W. (2d) 389); stating the sole question presented was whether the judgment in McGee's first action barred a recovery in his second action (1. c. 642 and 390 [1, 2], respectively). The court considered McGee's pleadings charged that his contract of employment was still in force; that breaches of the contract might therefore continue; and that the recovery in the first action was for breaches occurring between October 10, 1930, and December 15, 1933, and that the second action, which sought damages for additional breaches occurring between said December 15, 1933, and July 31, 1936, was not barred by the first action. (232 Mo. App. 1. c. 641, 643, 110 S. W. (2d) 1. c. 390, 391 [7, 8, 9]; and see 235 Mo. App. 1. c. 711, ▆▆▆ 133 S. W. (2d) 1. c. 676.) But the court also recognized: "However, there is a difference between discharging an employee and retaining his services but preventing him from laboring, such as presented in this case. Where a breach of a contract is equivalent to a termination of it or putting an end to it, then, there is no question but that the breach goes to the entire contract and but a single cause of action arises thereon to the party damaged." (232 Mo. App. 1. c. 642, 110 S. W. (2d) 1. c. 391[4].) The reasoning in said opinion concerning difficulties to be encountered on the measure of damages had McGee brought but one action to recover his entire damages, past and prospective. (232 Mo. App. 1. c. 644, 110 S. W. (2d) 1. c. 392[10]), is subject to the observation that yardmen of the Belt Railway wrongfully discharged would have found the same difficulties with respect to the measure of damages inescapable in the single cause of action stated in said opinion to exist for the breach of a contract equivalent to a termination of it. On the trial of McGee's second case, the Belt Railway offered no evidence. Among the facts shown by testimony offered on McGee's behalf was evidence that McGee had been cut off of the seniority list on June 1, 1932, and was not thereafter called for work; and the Belt Railway contended that its striking of McGee's name from the seniority list and failure to call him for work for more than four years prior to July 31, 1936, effectively terminated the relationship of employer-employee. The opinion of the court of appeals states: "Plaintiff offered evidence which tended to support the allegations contained in his pleadings" (235 Mo. App. 1. c. 710, 133 S. W. (2d) 1. c. 676); and, "considering the peculiar nature of the contract and of the relationship existing between defendant and its employees," that the record was left in such a state the court could not say, "as a matter of law, that plaintiff was not an employee of defendant during the term for which damages were allowed in this case" (1. c. 713 and 677, respectively). The court mentioned arguendo that the Belt Railway could have ended McGee's employment under "the unilateral contract and in-

definite term of employment . . . at its will;'' that it could have terminated McGee's employment by simply writing him a letter to that effect; that it could have discharged McGee without reference to the terms of its agreement with the Brotherhood and without giving him a service letter, subject, of course, to liability for any wrongful action in such respects; and also ''we also hold that if plaintiff is not, in fact, an employee of defendant he cannot recover damages for defendant's failure to call him to work.'' The holding was brought here on certiorari for an alleged conflict in rulings. We considered the cases cited by the Belt Railway were not similar in factual background; and stated: ''We are not called upon to say whether respondents were right or wrong in holding all these facts made a case for the jury. But we do rule the conclusion reached is not so at variance with facts of universal knowledge as to call for our intervention under State ex rel. Kansas City So. R. Co. v. Shain, supra, 340 Mo. loc. cit. 1203, 105 S. W. (2d) loc. cit. 919. We find no conflict with our decisions, from which it follows that our writ of certiorari should be, and hereby is ordered, quashed.'' [State ex rel. St. Joseph Belt Ry. Co. v. Shain (Banc), 346 Mo. 1098, 1102, 145 S. W. (2d) 131, 133.]

As stated the McGee cases involved damages accruing between October 10, 1930, and December 15, 1933, and between December 15, 1933, and July 31, 1936, respectively. The Statute of Limitation was not discussed and we are of opinion, in view of the fact McGee offered evidence tending to support the allegations of his pleadings, which included the charge that his contract of employment remained in effect, that such a similarity of issues does not exist as to necessarily require the overruling of the McGee case as to result should we reach a different result on the precise issue of the instant case under discussion. This observation also applies to Sparks v. Thompson (Mo. App.), 161 S. W. (2d) 977.

In the instant case the Railway's evidence did not aid plaintiff, who was his only witness.

The Railway agreed under Sec. (d) of Article 10 to return yardmen laid off on account of a reduction in force ''in order of their seniority'' when the force was increased, ''unless the management has good and sufficient cause for not returning them to service in line with their seniority, in which event the committee will be informed reasons therefor.'' The unilateral provisions of said Sec. (d) imposed no contractual obligation on plaintiff to return to work; but required performance by the ▪ alleged repudiator, i. e., the Railway's return of plaintiff to service in the order of his seniority, before plaintiff could enter upon performance on his part. The Railway officials did not inform plaintiff he had been discharged; neither did they inform him he had not been discharged. Plaintiff sought a return to service and reinstatement. In May, 1933, he knew he was not

being returned to service in the order of his seniority. He knew his name was not on the seniority list, the board. He did not establish that the Railway had not informed the local committee of the reasons for not returning him to service in the order of his seniority, whether its failure to return him to service was or was not for good and sufficient cause. This void in plaintiff's evidence was not supplied by defendant's evidence. All the direct testimony on such factual issue established the Railway's compliance with said Sec. (d).

Assuming, but expressly refraining from so ruling, the provisions of Article 17 are applicable, notwithstanding the provisions of Article 10 relating to yardmen laid off on account of a reduction in force, the Railway, without the approval of and without notice to plaintiff, could as readily breach the provisions of said Article 17 and terminate plaintiff's unilateral and indefinite term of employment as the provisions of said Article 10, charged by plaintiff to have been breached; subject, of course, to any proper action plaintiff might institute arising from any wrongful act in this respect by the Railway. Lyons v. St. Joseph Belt Ry. Co., 232 Mo. App. 575, 588[7], 84 S. W. (2d) 933, 942[7]; McGee v. St. Joseph Belt Railway Co., 235 Mo. App. 707, 712, 133 S. W. (2d) 675, 677[1, 3], among other authorities. The provisions of said Article 17 required charges against yardmen to be in writing, required an investigation, etc., before inflicting punishment in the form of dismissal, suspension or assessing demerit marks, required the rendition of a decision within five days after an investigation, with privilege in the yardmen to be present, to appeal, etc. These provisions (as well as certain of the provisions of the Yardmen's Schedule set out in the margin) contemplate the elimination of unreasonable delays in transactions between the Railway and its yardmen.

The failure, if any, of the Railway to comply with the provisions of Article 10 or Article 17 was not a slight breach of the Yardmen's Schedule. It was not an inconsequential trifle having no pecuniary importance. It reached to the very heart of his contract of employment and of the Yardmen's Schedule. It deprived him of his right to work, to earn wages for his livelihood, and to demand payment therefor under his contract of employment and the Yardmen's Schedule. When a contract is breached, the wrongdoer either desires performance to continue or not to continue. The injured party may always continue performance if the repudiator consents. Plaintiff was let out of service in 1931 on account of a reduction in force. If his indeterminate and impermanent contract of employment be considered as continuing thereafter by virtue of the provisions of Article 17 of the Yardmen's Schedule, the Railway effectively prevented plaintiff from further performance thereunder by not returning him to service and there arose an indisputable breach of the contract of employment and the Yardmen's Schedule. Ultimate

performance of the Railway's obligation charged to have been breached was due when plaintiff was entitled to return to service under said Sec. (d) in May, 1933, and the breach, if any, occurred when it then failed to perform. Ordinarily a plaintiff's cause of action accrues upon a defendant's failure to do the thing at the time and in the manner contracted, and a Statute of Limitation begins to run when a suit may be maintained therefor. It is not logical for one to call the breach of a contract something other than a breach or to say he continued the performance of a contract when the wrongdoer prevented him from further performing. Generally, when a wrongdoer breaches performance of a contract, the injured party is required to take cognizance of the change in the relation thereby created. This should be especially applicable where the breach results in preventing further performance by the injured party as here; and if Article 17 operated upon the instant situation, it should not extend the time for taking cognizance beyond a reasonable period. Otherwise an employee would be relieved of that duty the law places upon him to exercise reasonable diligence to avoid needless injury (sometimes stated in cases involving contracts to be the duty to mitigate the damages), would be considered as performing a contract breached to such an extent as to preclude any such actual performance, and would be authorized to institute an action fifteen or twenty years after such breach of a contract of employment as readily as seven years thereafter. The same agreement that was involved in the McGee cases, supra, was before the court in McCoy v. St. Joseph Belt Ry. Co., 229 Mo. App. 506, 519, 77 S. W. (2d) 175, 183 [10], which was similar to the McGee and the instant actions. A judgment for McCoy was set aside because the evidence did not clearly establish when McCoy would have been entitled to return to service in the order of his seniority, the court also observing: "Nor is it definite and specific as to *when* or *how long* he could reasonably have hoped to be recalled to work and therefore rightfully hold himself in readiness to work; for only *to this extent* could he recover damages for loss of wages." We, therefore, are of opinion that any fair minded man, with knowledge of the facts admittedly possessed by plaintiff, would have concluded long prior to, say April 30, 1935, the approximately two years here involved that the Railway had breached the provisions of Article 17, if applicable, and in the circumstances it is the duty of the court to so declare as a matter of law. See also Bisesi v. Farm & Home S. & L. Assn. (Mo. App.), 78 S. W. (2d) 871, 874 [8-11]. Plaintiff thereafter may have had an action based on the Railway's failure to comply with Article 17, if applicable, for discharging him without "just and sufficient cause."

 Furthermore, with plaintiff knowing he was not being returned to service or reemployed, his dealings with the Railway were at arm's length. The circumstances were such as to put a man of

ordinary prudence on inquiry and required the exercise of reasonable diligence. Plaintiff never exhausted his available sources of information. Under Sec. (d), the Railway was required to inform the Grievance Committee of the Brotherhood of its reasons for not returning plaintiff to service in the order of his seniority. Plaintiff never made inquiry of the Brotherhood. It has been often pointed out that Statutes of Limitation rest upon reasons of sound public policy in that they tend to promote the peace and welfare of society, safeguard against fraud and oppression and compel the settlement of claims within a reasonable period after their origin and while the evidence remains fresh in the memory of the witnesses. They constitute a personal privilege in the debtor to say the debt is stale to a creditor responsible for the hardship entailed. They bar the remedy, not the obligation. The obligation of a contract and the remedy to enforce it differ in the time of their origin. The obligation for performance arises upon the making of the contract and operates anterior to the performance. The remedy for the breach of a performance cannot exist prior to the breach, and then operates to enforce the preexisting obligation. Shelby County v. Bragg, 135 Mo. 291, 300, 36 S. W. 600, 602, states: ''Statutes of limitation are favored in the law and cannot be avoided unless the party seeking to do so brings himself strictly within some exception. 'A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it.' . . . A party cannot avail himself of this exception to the statute where the means of discovering the truth were within his power and were not used. . . . [Citations omitted.]'' Plaintiff's case goes no farther than ignorance of the facts.

The discussion assumes the applicability of Article 17 of the Yardmen's Schedule; and the result reached dispenses with the necessity of considering any right in the Railway to invoke the provisions of Sec. (d) of Article 10 expressly authorizing a refusal to return a yardman to service in the order of his seniority for ''good and sufficient cause'' and the defense of the Statute of Limitation in connection therewith.

The judgment is reversed. *Westhues, C.,* concurs; *Barrett, C.,* not sitting.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.