Harry IRWIN et al., Respondents,

v.

**GLOBE–DEMOCRAT PUBLISHING COMPANY, a corporation, Appellant.**

No. 49026.

Supreme Court of Missouri,

Division No. 2.

April 8, 1963.

Motion for Rehearing or to Transfer to Court En Banc Denied June 4, 1963.

Hocker, Goodwin & MacGreevy, Lon Hocker, St. Louis, for defendant-appellant.

William A. Geary, Jr., St. Louis, for respondents.

STOCKARD, Commissioner.

This is an appeal from a judgment wherein seventeen plaintiffs were awarded "dismissal pay" in various amounts totaling $20,260.90 alleged to be due pursuant to the terms of a collective bargaining agreement between the St. Louis Paper Handlers, Sheet Straighteners and Stock Room Employees' Union No. 16 (hereafter referred to as "Local No. 16"), affiliated with the International Printing Pressmen and Assistants' Union of North America AFL–CIO, and the St. Louis Newspaper Publishers' Association, of which the Globe-Democrat Publishing Company (hereafter referred to as the "Globe-Democrat") was a member.

On February 21, 1959, certain employees of the Globe-Democrat who were members of the St. Louis Newspaper Guild, a labor union not directly affiliated with Local No. 16, went on strike and established a picket line at the Globe-Democrat's place of operations. Although the collective bargaining agreement, under which the plaintiffs as members of Local No. 16 were working and upon which this suit is based, provided that members of Local No. 16 had a right to decline to cross a picket line only when the picket line resulted "from a strike that has been sanctioned by the International Printing Pressmen and Assistants' Union of North America," and the Guild strike was not so sanctioned, the plaintiffs declined to cross the Guild picket line, or at least they did not do so. On the day the Guild strike started the publisher of the Globe-Democrat sent a letter to each plaintiff in which he stated, among other things, "I regret very much that the Globe-Democrat will not be able to publish its Sunday edition because of a strike by the St. Louis Newspaper Guild. It does not appear probable that publication will be resumed in the immediate future." On the following day the Globe-Democrat sent a telegram to the president of Local No. 16, which was received by him, in which it was stated that no "lockout" of the members of Local No. 16 existed and that "Any Globe-Democrat employee member of your Union who has presented himself today or continues to report for work at his accustomed place of work on his regular work days and hours will be put to work and paid his regular day's pay at the straight time rate until the work stoppage caused by the Newspaper Guild is ended or until further notice." No plaintiff presented himself for work.

On February 27, 1959, the Globe-Democrat sold to the St. Louis Post-Dispatch all of its physical property for the printing of its newspaper and entered into a contract with the Post-Dispatch whereby it would print the Globe-Democrat newspaper when the Guild strike ended. A notice of this sale was furnished to the president of Local No. 16 and to each plaintiff. Prior

to February 27, 1959 eleven of the plaintiffs had accepted employment with the Post-Dispatch, and shortly thereafter and before the Guild strike ended, the remaining plaintiffs accepted such employment. On May 27, 1959, the day the Guild strike terminated, a number of the plaintiffs and the president of Local No. 16 went to a place near the Globe-Democrat building and the president called the personnel director of the Globe-Democrat by telephone and asked "if they wanted them to come into the plant," and was advised that "they were no longer employed by the Globe-Democrat Publishing Company."

By this suit plaintiffs as third party beneficiaries, Baron v. Kurn, 349 Mo. 1202, 164 S.W.2d 310, 142 A.L.R. 787, seek to recover "dismissal pay" pursuant to a collective bargaining agreement between Local No. 16 and the St. Louis Newspaper Publishers' Association, the relevant provisions of which are as follows:

"Article XII. *Dismissal Pay.* Sec. 1. In the event of merger, consolidation or permanent suspension of publication by any newspaper covered by the Agreement all employes who lose employment thereby shall receive dismissal pay as follows:

"(a) Employes who have held regular situations for more than six (6) months but less than one (1) year shall be paid six (6) weeks' dismissal pay.

"(b) Employes who have held regular situations for more than one (1) year shall be paid twelve (12) weeks' dismissal pay.

"Sec. 2. Any employe who has held a regular situation for one (1) year or more who is laid off to reduce the force shall receive dismissal pay on the basis of one (1) week's pay for each year of continuous priority.

"Sec. 3. Dismissal pay shall be at the employe's regular straight time rate of pay as of the time of dismissal.

"Sec. 4. When an employe is laid off due to a reduction in force he shall hold re-employment rights in the chapel from which he was laid off for a period of one (1) year. Refusal of an employe to take a job in chapel, when called back to work, shall waive his re-employment rights."

Plaintiffs alleged in their petition that they "were laid off to reduce the force of defendant, thereby entitling them to receive dismissal pay under Sections 2 and 3 of Article XII of said Collective Bargaining Agreement." They further alleged the circumstances of the sale by the Globe-Democrat of its printing facilities, and that upon termination of the Guild strike on May 27, 1959, they presented themselves at the defendant's place of business "ready, willing and able to continue their employment, but plaintiffs were then notified of their lay-off by defendant." Prior to the trial each plaintiff made answers to interrogatories under oath and stated therein that the "last date he was employed by defendant" was May 27, 1959, and that "he was laid off by defendant at that time." Notwithstanding the allegations in their petition and the above answers to the interrogatories, which were not amended, plaintiffs submitted their case to the jury, and now contend on this appeal, that they were " 'laid off to reduce the force' on February 27, 1959," because on that day the Globe-Democrat "contracted away the printing of its newspaper," sold the tools "necessary to fulfill those operations," and notified plaintiffs of the sale. "Taken together," plaintiffs contend, "the circumstances operate to entitle respondents to dismissal pay under Article XII, Section 2 of their contract." This change in position apparently was believed necessary because the collective bargaining agreement upon which this suit is based, by its express terms, expired on December 31, 1958. It was then extended by oral agreement to March 2, 1959, but was not further extended insofar as the Globe-Democrat was concerned, and a new agreement was nego-

tiated between Local No. 16 and the St. Louis Post-Dispatch only, which was executed on May 13, 1959, two weeks before the Guild strike was terminated. At that time each and all plaintiffs had accepted employment at the Post-Dispatch.

On this appeal the Globe-Democrat contends that plaintiffs are bound by their pleadings and the answers to their interrogatories and as a result they did not establish the occurrence of a layoff to reduce the force while a contract was in existence. It also contends that if the pleadings and answers to interrogatories be ignored and it be considered that plaintiffs' employment was terminated on February 27, for the reasons and under the circumstances contended by plaintiffs, the termination did not amount to a layoff to reduce the force. In view of our ruling on the second contention we need not rule the first.

■ The collective bargaining agreement does not provide for "dismissal pay" in all situations where the employment status is terminated, other than those specifically excepted, as do some and probably most labor agreements. See Globe-Democrat Publishing Company v. Industrial Commission, Mo.App., 301 S.W.2d 846; Talberth v. Guy Gannett Publishing Company, 149 Me. 286, 100 A.2d 726, 40 A.L.R.2d 1036; Matthews v. Minnesota Tribune Co., 215 Minn. 369, 10 N.W.2d 230, 147 A.L.R. 147; 40 A.L.R.2d 1044. On the contrary, it provides for "dismissal pay" in only certain specifically defined situations, and in doing so it relieves the employer of any liability for "dismissal pay" in all other situations. In determining whether the termination of employment at the time and for the reasons asserted by plaintiffs constituted one of the specific situations in which dismissal pay is required to be paid, the collective bargaining agreement is subject to the same rules of interpretation as other contracts and should be realistically construed to accomplish its evident aims. 56 C.J.S. Master and Servant § 28 (41)a.

■ Plaintiffs make no contention that they are entitled to "dismissal pay" pursuant to Section 1 of Article XII of the agreement. Their claim is based solely on the theory that their employment status was terminated on February 27, 1959, and that that termination constituted a layoff to reduce the force. "The term 'layoff', in the field of employment, has a well-defined meaning. * * * It does not mean termination of employment, but rather does it mean: 'The act of laying off, esp. work or workmen; a period of being off or laid off work; a shutdown; a respite.'" ACF Industries, Inc. v. Industrial Commission, Mo., 320 S.W.2d 484, 491. As stated in 56 C.J.S. Master and Servant, § 29, "'Labor separations' are classified as 'quits,' * *, 'discharges' * * *, and 'layoffs,' which have been defined as terminations of employment at the will of the employer, without prejudice to the worker, and may be due to lack of orders, technical changes, or the failure of flow of parts or materials to the job, as needed." A "layoff," as distinguished from a discharge, contemplates a period during which a working man is temporarily dismissed, Fishgold v. Sullivan Drydock & Repair Corp., 2 Cir., 154 F.2d 785, 788, and it also refers to that suspension of work or employment during a part or season of the year when business activity is partly or completely suspended. Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S.Ct. 1105, 1112, 90 L.Ed. 1230, 167 A.L.R. 110. See also Lord Mfg. Co. v. Nemenz, D.C., 65 F.Supp. 711; International Ass'n. of Machinists v. State ex rel. Watson, 153 Fla. 672, 15 So. 2d 485; Anderson v. Twin City Rapid Transit Co., 250 Minn. 167, 84 N.W.2d 593; State ex rel. Ausburn v. City of Seattle, 190 Wash. 222, 67 P.2d 913, 111 A.L.R. 418. An employee "laid off" does not have his employment status completely and finally terminated. He ordinarily is entitled to re-employment when the temporary situation calling for the layoff has been corrected or eliminated. The precise term used in this case was "laid off to reduce

**456**

the force" which has reference to the situation where an employee is temporarily laid off with re-employment rights because neither he nor any one else is then needed to perform the work he ordinarily performed. This is to be distinguished from the situation where an employee is laid off for a temporary period for disciplinary reasons. In this latter situation there is no reduction in force. Yet, without the qualifying phrase "to reduce the force" being in the agreement the employer would be required to make payment of "dismissal pay," in such situations; a result obviously not intended. The collective bargaining agreement in this case used the term "laid off to reduce the force" in the above sense because it specifically provides that an employee "laid off due to a reduction in force" shall "hold re-employment rights in the chapel [place of employment] from which he was laid off for a period of one (1) year." While there is no separate provision in the agreement pertaining to "discharges" and "lay offs," reference is made in Article IX, pertaining to vacations, to "an employe discharged for cause." This indicates a knowledge of the distinction between "lay offs" and "discharges."

█ On February 27, 1959, each plaintiff was not working because he was voluntarily refraining from reporting for work. He was not "laid off to reduce the force" because the termination of employment, even under plaintiffs' theory, was not intended to be temporary with re-employment rights. The termination of plaintiffs' employment was permanent and therefore they were "discharged." The collective bargaining agreement does not provide for "dismissal pay" to a "discharged" employee except as set forth in Section 1 of Article XII, and plaintiffs expressly disaffirm any claim pursuant to that provision. This construction of the agreement is consistent with its evident aims. A "discharged" employee is entitled to "dismissal pay" in the amount provided (which is greater than when laid off to reduce the force) when the discharge results from the specifically stated situations

and he loses employment thereby. An employee is entitled to "dismissal pay" in a lesser amount when he is "laid off to reduce the force," that is, not for disciplinary reasons, with re-employment rights for one year. In this case neither factual situation came into existence.

The authorities cited and relied upon by plaintiffs are readily distinguishable. In Matthews v. Minnesota Tribune Co., 215 Minn. 369, 10 N.W.2d 230, 147 A.L.R. 147, the collective bargaining agreement provided for severance pay "upon dismissal, except for drunkenness, proven dishonesty or gross neglect of duty." The newspaper employer sold all of its business to another newspaper. The court held that when an employer disposes of all of his business it operates as a discharge or dismissal of his employees. The right to severance pay accrued in the event of a dismissal except in three specifically defined situations. Here the right to dismissal pay accrued, as far as plaintiffs are concerned, only in the event they were "laid off to reduce the force" and when they retained employment rights for one year. In re Public Ledger, 3 Cir., 161 F.2d 762, pertained to a bankruptcy proceeding. It was held that suspension of the business in bankruptcy amounted to a discharge of the bankrupt's employees, and that because of the use of the terms "layoff" and "discharge" in the collective bargaining agreement, "the 'layoff' provisions of the contract are in fact provisions covering discharge as well as temporary layoffs." While the language of that agreement may have justified the conclusion there reached, we find no reason to say in this case that both of the parties to the agreement intended to say one thing when they in fact said another. Plaintiffs also rely on the reported decisions in two arbitration cases. Regardless of the credence these two reports are entitled to receive, they do not support plaintiffs. In the Standard Oil of California case, 31 Labor Arbitration Reports, 472, the union there contended contrary to the position of plaintiffs in this case that the term "layoff" "refers to a tem-

porary status, rather than a permanent termination of employment." The arbitrator held that in the contract "No clear distinction is made between a 'discharge' and a 'layoff,'" and that the term "layoff" as used in the agreement was not limited to a temporary severance of employment but envisioned the possibility of a permanent separation. For the reasons previously stated, a clear distinction was made in the use of the terms in this case. In Brooklyn Eagle, 32 Labor Arbitration Reports, 156, plaintiffs quote not from the opinion but from the head note. In that case the newspaper permanently ceased all operations during a strike. The labor agreement provided for "severance indemnity" for "dismissal" except when for "dishonesty, repeated drunkenness after warning, gross neglect of duty or gross insubordination." This is in substance the same as the Matthews case.

■ The agreement in this case was negotiated by Fred A. Atkins on behalf of Local No. 16 who at time of trial had been a member of the union for fifteen years. He had been an officer of the union for ten years including seven years as president, and he had also served as business agent. The agreement was signed by Mr. Atkins and by Tom LaRocca, who participated in the negotiations and was "standing committee member on the Executive Board" of Local No. 16. The negotiators for the St. Louis Newspaper Publishers' Association were Richard G. Baumhoff and Munro Roberts from the Post-Dispatch and G. D. Bauman from the Globe-Democrat. It is not unreasonable to assume that all of these persons were familiar with the newspaper business and that they held themselves out, at least to some extent, as experts in the field of labor negotiations. The process of collective bargaining over the terms of a labor contract, at least in theory, results in demands, counter demands and concessions until an agreement is reached. It is not the situation where one party presents a written proposed agreement subject only to acceptance as presented or rejection. The process of collective bargaining necessarily

implies that the terms of an approved agreement were thoughtfully prepared by persons seeking to express the precise agreement between the parties. In the absence of some reason to require a different rule, and we find none here, "The test of the meaning, of words commonly used, should be their ordinary and popular meaning; and they should not be construed in the broadest sense possible to include meanings to which they would not be applied by most people." Cleaver v. Central States Life Ins. Co., 346 Mo. 548, 142 S.W.2d 474, 129 A.L.R. 1094. We have no right, in interpreting a collective bargaining agreement, to say that by the use of words and phrases which have well-defined and commonly understood meanings in the field of labor relations the parties did not mean what they said. We cannot interpret such an agreement as we may think it should have been written. Neither can we interpolate words into an agreement which are not there and thereby rewrite the agreement to what third party beneficiaries of that agreement now argue the parties surely must have meant because otherwise the agreement does not favorably cover, as to them, a situation which subsequently arose. For all we know, the language used in the agreement was intentionally used as the result of a compromise between demands by the union for dismissal pay in the event of termination of employment for any reason and a demand by the employer representatives that there be no provision whatever for dismissal pay.

Plaintiffs were not "laid off to reduce the force" but were discharged, or at least their employment with the Globe-Democrat was permanently terminated. The terms of the collective bargaining agreement upon which plaintiffs rely do not impose an obligation on the Globe-Democrat to pay to plaintiffs "dismissal pay" under those circumstances, and no obligation for such payment exists in the absence of an agreement.

The judgment is reversed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.

On Motion for Rehearing or to
Transfer to Court En Banc.

PER CURIAM.

Plaintiffs contend in their motion for rehearing that we did not "take into account section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A., Section 185(a) and the decided cases of the Supreme Court of the United States holding that there should be a uniform body of substantive law conformable to the federal law in the field of labor relations," and that in deciding issues arising out of collective bargaining contracts this court "was sitting as a court of the United States," and consequently it was bound by the Seventh Amendment to the Constitution of the United States.

■ We have examined plaintiffs' brief filed in this court and we fail to find any reference to the above contentions. Only one federal case was cited in their brief, In re Public Ledger, Inc., 3 Cir., 161 F.2d 762. Plaintiffs placed their complete reliance upon that case and upon cases from this and other states, and upon the report in two arbitration decisions, all of which we expressly considered in the opinion. It has long been the rule that new propositions and complaints not submitted in the original brief, Ford v. Wabash Ry. Co., 318 Mo. 723, 300 S.W. 769, 778, and raised for the first time after the opinion is handed down, Phippin v. Missouri Pacific R. Co., 196 Mo. 321, 93 S.W. 410, 418, or which are clearly afterthoughts, State ex rel. Cole v. Matthews, Mo., 274 S.W.2d 286, 292, will not be considered on motion for rehearing. We do not propose now to change or relax that rule. However, if in a suit in a state court on a collective bargaining agreement by an employee we are

required to apply "federal substantive law," and we did not do so and the result reached is contrary to. such law, then plain error would have resulted. In our discretion, we may consider plain error affecting substantial rights, Civil Rule 79.04, V.A.M.R., and on that discretionary basis we shall examine the contention, presented now for the first time, that we erred in not ruling the case pursuant to "federal substantive law" which plaintiffs at no time urged.

Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185(a), provides as follows: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." In Smith v. Evening News Association, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246, the United States Supreme Court, speaking through Mr. Justice White, stated that this section "has substantive content and that Congress has directed the courts to formulate and apply federal law to suits for violation of collective bargaining contracts." Quoting then from Local 174, Teamsters, etc. v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593, the court also said: " 'The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.' "

Plaintiffs assert that because "federal law" is to be applied to this case the "opinion should be reviewed to determine if it is harmonious with the body of substantive law in the field of labor relations as promulgated by the federal courts," and that if it is not this court should modify its opinion to so conform. The "body of substantive law" relied upon by respondents in their motion for rehearing, and in the

suggestions in support thereof, consists of but one federal case (another federal case is cited in support of a different point), the same one cited in their original brief to this court, In re Public Ledger, Inc., 3 Cir., 161 F.2d 762, and their argument pertaining to the substantive law of that case is precisely the same as that presented in their original brief which we carefully considered and rejected as decisive of the issue on appeal. Upon re-examination we are still of the opinion that In re Public Ledger, Inc. does not require nor justify a ruling different from that reached in the principal opinion.

In the preparation of the principal opinion we ruled the issues by giving the language of the contract its normal meaning in accordance with its accepted usage. In determining this meaning we looked not only to the one federal case and the numerous state cases cited by respondents, but we also looked to and relied on other cases found by us in the course of our research including two cases in the lower federal courts and one opinion of the Supreme Court of the United States. No federal case was then found, none has been found upon re-examination, and respondents certainly have cited no federal case which, in the words of Mr. Justice White, formulates and applies federal law which would require or justify a result different from that we reached in the principal opinion. Assuming, therefore, that in this suit we were required to apply federal substantive law, it is our conclusion that we did so and that we did so correctly. There is absolutely nothing in Smith v. Evening Press Association, or the other federal cases cited by plaintiffs in the motion for rehearing, which directly or inferentially holds that the result we reached is contrary to federal substantive law, and plaintiffs certainly have not demonstrated that on the merits we reached an incorrect result.

█ We do not agree, assuming we are required to apply federal substantive law, that in doing so this court "was sitting as a court of the United States" any more than

it is sitting as a court of a sister state when it applies the law of that state. Therefore, there is no merit to the contention that the Seventh Amendment to the Federal Constitution has any application to this case.

All other matters in the motion for rehearing have been carefully considered and are found to be without merit, and the motion for rehearing is overruled.

Respondents also assert that because of the issues presented for the first time in their motion for rehearing "there is now involved in this cause a federal question," and they are entitled to have this case transferred to the court en banc.

█ Section 9, Article V, Constitution of Missouri, V.A.M.S., provides that a cause shall be transferred to the court en banc when (a) the members of a division are equally divided in opinion, (b) when the division shall so order, (c) on the application of the losing party when a member of the division dissents from the opinion therein, (d) when "a federal question is involved," and (e) pursuant to supreme court rule. This court has held that the term "federal question" as used in Section 9 of Article V is to be "interpreted according to the standard" contained in Section 3 of Article V, pertaining to jurisdiction of the supreme court, which refers to "cases involving the construction of the Constitution of the United States or of this state, the validity of a treaty or statute of the United States, or any authority exercised under the laws of the United States, * * *." McAllister v. St. Louis Merchants' Bridge Terminal Ry. Co., 324 Mo. 1005, 25 S.W.2d 791; Huckleberry v. Missouri Pac. R. Co., 324 Mo. 1025, 26 S.W.2d 980, 988; Pashea v. Terminal R. Ass'n of St. Louis, 350 Mo. 132, 165 S.W.2d 691, 696; State ex rel. Perrine v. Keirnan, 361 Mo. 871, 237 S.W.2d 156. This case, as submitted to this court, did not involve a federal question. New matters not submitted in the original brief but raised for the first time in a motion for rehearing after the opinion is handed down do not present any federal

question requiring a transfer to the court en banc. No supreme court rule requires a transfer of. this case, and after careful consideration we conclude that no reason exists for this division to order a transfer. The alternative motion to transfer to the court en banc is·denied.