In the Matter of the Will of WILLIAM H. WALKER, Deceased.

Surrogate's Court, New York County, December 29, 1944.

*Greene & Greene* and *Daniel J. Mooney* for Richard T. Greene and another, as trustees, petitioners.

*Choate, Byrd, Leon & Garretson* for Edgewater Creche and others, respondents.

*Cravath, de Gersdorff, Swaine & Wood* for· Travelers Aid Society, respondent.

*Van Vorst, Siegel & Smith* for Tuskegee Institute, respondent.

*Cadwalader, Wickersham & Taft* for Salvation Army, respondent.

*McKercher & Link* for New York Medical College, Flower and Fifth Ave. Hospitals, respondents.

*Mitchell, Capron, Marsh, Angulo & Cooney* for Manhattan Eye, Ear and Throat Hospital, respondent.

*Paul E. Lord* and *C. Donald Richards* for Society of the Lying-in Hospital of the City of New York, respondent.

*Ferris, Burgess, Hughes & Dorrance* for First Bank & Trust Company of Utica, as executor and trustee under will of Gertrude D. Walker, deceased, and others, respondents.

*William J. Navin* and *George R. McCormick* for Mae P. Romano and another, respondents.

*Harold H. Corbin* for John W. Jackson, claimant, respondent.

*Emmett W. Poindexter,* special guardian for William C. Adams, Jr., infant.

*Sarah B. Relyea,* special guardian for Elaine S. Watt, an infant, and others.

*Ira L. Anderson* for Mary A. Hughes and another, respondents.

*H. Maurice Darling* for American Public Health Association, respondent.

*De Forest & Elder* for Community Service Society of New York, respondent.

*Ehlermann & Crawford* for Gloria H. Anable and another, respondents.

*Matthew B. Price* and *MacNeil Mitchell* for Walter Scott Free Industrial School for Crippled Children, Inc., respondent.

*Floyd D. Frost* and *Abel I. Smith* for Stevens Institute of Technology, respondent.

FOLEY, S. In a prior decision the Surrogate disposed of certain preliminary questions involving the construction of the will. (*Matter of Walker,* N. Y. L. J., May 26, 1944, p. 2040, col. 3.) The primary facts were stated in that decision. The testator, as donor, granted in his will certain powers of appointment to his daughter, Gertrude D. Walker. She exercised these powers by her will.

There remain for determination several independent issues raised by answer and by objections to the account. The parties have stipulated the facts on certain of these issues. The Surrogate has taken evidence on another issue.

The first group of these questions involves the status of certain persons who claim they were employed under the terms of the will and thereby are entitled to legacies.

(1) Dr. John W. Jackson claims that he was employed by Miss Walker at the time of her death and that he had been so employed by her for ten and a half years. He contends that he is entitled to a legacy in the sum of $55,200. In opposition to his contention it is urged that he was merely retained professionally. His objections are overruled and his claim is dismissed on the merits. The Surrogate holds that the objectant was not in the "employ" of the donee and that he is not entitled to any legacy under the terms of subdivision (b) of paragraph tenth of her will.

In that subdivision the donee gave "to each person in my employ * * * at the time of my death and who have been in my employ * * * for more than one year immediately preceding my death, one year's salary at the rate paid at the date of my death * * *." In addition to the full year's salary the donee bequeathed to any person who shall have been in her employ for more than five years an additional year's salary for each full year that they shall have been employed by her.

Miss Walker had been an invalid from childhood. In January, 1931, she contracted pneumonia. Her attorney arranged at that time for Dr. Jackson to attend her for the first time. He treated her during the period of her illness and continued to render medical services thereafter. At this period he was compensated in the usual professional method of charges. For each visit to the donee at her home in New Jersey he was paid $100; for each office visit he charged and was paid $75; and for each hospital visit he received $30. For the three months' period between April 3 and July 1, 1931, he received a total of $3,965.

In the Winter of 1931, after her serious illness, Miss Walker's attorney discussed with her the desirability of having regular medical and nursing attendance with the view of preserving her health and preventing avoidable illness. Miss Walker assented to this plan. During the first year, no exact arrangements were made for the doctor's visits. He continued to visit her at her home in New Jersey and Massachusetts and was paid for his services on the basis of charges for specific treatments.

This arrangement continued until sometime in July, 1932. Miss Walker was apparently satisfied with the services rendered to her but felt that she was being overcharged. She directed her attorney to endeavor to make arrangements to have the work

done more reasonably. Accordingly an agreement was made with the objectant whereby he was to be paid on a monthly retainer basis instead of upon a charge per visit. At first, it was agreed that he would receive $600 a month and his expenses. In the following ten years this retainer was modified in accordance with the fluctuations of Miss Walker's income. The charges in the last month of the donee's lifetime were reduced to $400. There was never any agreement that the objectant was to spend any specified amount of time in the treatment of the donee. It was left entirely to his judgment of the condition of her health. The objectant visited her on an average of twice a month. The agreement of retainer involved no contract for a fixed period of service.

This practice continued up to the time of Miss Walker's death on December 17, 1942. The objectant last visited her on or about December 8, 1942. He did not attend her personally during her fatal illness. There was an attempt to establish that the objectant terminated the relationship in early December. It appeared, however, that Dr. Jackson himself was in ill health and unable at that time to make the trips to her country home in Massachusetts where the donee then lived. The evidence fails to show that he permanently withdrew as her physician. It indicates merely his temporary disability to attend the patient, without either a discharge by the patient or a renunciation of attention by the physician.

Dr. Jackson characterizes the relationship between himself and Miss Walker as that of servant and master and contends that he had been in her '' employ '' at the time of her death and for more than ten years prior to that time. His claim is opposed by the trustees and by the beneficiaries who would share the burden of the payment if allowed.

It would serve no useful purpose to discuss the cases called to the Surrogate's attention in which it has been determined that a professional man did or did not have the status of an employee within the meaning of some particular statute. '' These statutes have been interpreted by the courts, and effect given to them restricted or liberal in view of the supposed policy and general legislative intent indicated by the particular terms employed.'' (*Gurney* v. *Atlantic & G. W. R'y Co.*, 58 N. Y. 358, 370.)

The objectant also stresses the applicability of *Kay* v. *General Cable Corporation* (144 F. 2d 653, 654). In that case the court construed the Selective Service Act (U. S. Code, tit. 50, Appen-

dix, § 301 *et seq.*) " in the light of the purpose which Congress intended to accomplish." The facts there differ widely from those in the pending proceeding and show a close control over the time of service of the physician and an express written recognition in selective service proceedings of his status as an employee.

These decisions have no relevancy to the language of the will or the search for testamentary intent. The sole inquiry here is whether within the intent of the donee as expressed in her will the objectant was in her " employ ". " When such words are used in a will we must endeavor to place ourselves, so far as we can, in the position of the testator and from that viewpoint seek the meaning which was in the mind of the testator when he used these words." (*Wiseman* v. *Phipps,* 288 N. Y. 311, 313.)

The Surrogate holds the words " in my employ " were used in their ordinary and general sense to denote a class of persons whose relationship with the donee was the usual one of employer and employee. Such provisions in wills are not at all uncommon. (See 3 Page on Wills, § 1035; 69 C. J., Wills, § 1217.)

It is clear that under the evidence in this proceeding the objectant did not enjoy the status of an employee and that Miss Walker never regarded him as a person in her employ. When originally retained to attend her, his status was the same as any physician called in to prescribe for a patient. A physician is not usually regarded as a servant or employee of his patient. (Restatement, Agency, § 223.) He may be an employee under the facts of a particular case where the claimant meets every test of " permanence of duty, of intimacy of contact, and of fullness of subjection " so as to indicate a master and servant relationship rather than the usual professional one. (CARDOZO, J., in *Matter of Bernstein* v. *Beth Israel Hospital,* 236 N. Y. 268, 271; Restatement, Agency, §§ 220, 223, Comment [a].) That, however, is not the case here.

The original retainer of Dr. Jackson was no different from the retainer by any other one of his patients. Indeed, he does not contend otherwise for in his objections he places the inception of the alleged employment, not in 1931 when he was first called, but in July, 1932.

The change from fees based upon professional visits or specific treatments to a fixed monthly charge in July, 1932, was made for the sole purpose of effecting a reduction in the charges During the first year of attendance, the objectant had received approximately $12,000 in fees. After the arrangement for a

monthly retainer was made, as well as before,. the objectant was not required to treat Miss Walker exclusively. After that time, as before, he continued to send her monthly bills " for professional services ". Some of the bills bore additional words " monthly charge ". He remained free to maintain his office and to treat other patients. He remained at liberty to come and go as he pleased. After July, 1932, he visited her on an average of twice a month on days chosen by him. He was subject to call at infrequent times when especially needed.

The evidence admits of only one inference, namely, that the relationship after July, 1932, continued just as before except for the limitation upon the amount charged. A change in the method of paying compensation does not conclusively show a change in relationship between the parties. The decision of the Circuit Court of Appeals on this point in *Meigs* v. *United States* (115 F. 2d 13, 17) is particularly pertinent here. The court said: " Nor is it vital that the plaintiff is now paid on a salary basis rather than on the former fee basis, since the duties performed are the same and the change in compensation was made solely for reasons of economy and not in order to change the relationship between the parties. * * * A method of measuring compensation is of little significance."

The evidence shows that Miss Walker never regarded the objectant as an employee. He was never carried upon any payroll or listed among employees. He had no social security number and was never subject to any social security deductions. The term " salary " never appeared in his monthly bills. In his income tax returns, the objectant never reported this compensation as " salary " but included it in his income from his " business or profession ".

It is of interest that her attorney was also paid a monthly retainer for professional services rendered during practically the same period as those of Dr. Jackson. While it is not controlling, neither he nor his firm has made any claim to be entitled to a legacy on the ground of being in Miss Walker's employment.

The Surrogate accordingly holds that Dr. Jackson was not in the employ of the donee, and that she did not intend to include him as a legatee under paragraph tenth of her will. His claim is disallowed in its entirety.

(2) The question raised by the objections of Alfred Cordes is whether an employee who had been inducted into the military service of the United States prior to the death of the donee continues to be " in the employ " of the trustees during the period

of his military service. His objections are sustained. The Surrogate holds that he is entitled to a legacy under the terms of paragraph tenth, subdivision (b-2), of the codicil of the donee.

In the codicil dated September 25, 1940, the donee of the power of appointment added subdivision (b-2) to the tenth paragraph of her will. In a preamble to this codicil she expressly declared her intention to make provision not only for her own direct employees but also for those who were employed by the trustees under her father's will.

The new subdivision reads as follows: " I give and bequeath to each person who, at the time of my death shall be in the employ " of the trustees in their official capacity " and being paid compensation therefor directly from my father's estate as salary or wages on a daily, hourly or other basis * * * and who shall have been so employed by said * * * trustees during a period of more than one year immediately preceding my death, whether continuously or not, a sum of money equal to the amount of compensation so received by such employee from such * * * trustees during the year immediately preceding my death."

To persons who had been employed for more than five years, the donee gave an additional sum equal to the amount of compensation received by the employee during the year immediately preceding her death, multiplied by the number of additional years, not exceeding ten.

The objectant Cordes had been employed by the trustees at " Brookside " continuously from July, 1930, to August 21, 1942 On the latter date he was inducted into the armed forces of the United States in accordance with the provisions of the Selective Service Act. At the time of the death of Miss Walker, Mr. Cordes was serving his country in the United States Army. Sometime after her death, he died in military service in Italy. His death occurred during the pendency of this proceeding and his personal representative became a party in his place.

The country estate " Brookside " located at Great Barrington, Massachusetts, had formerly been owned by the testator. In his will he devised and bequeathed the real estate and all personal property used in connection with it to his trustees. In addition, he gave his trustees a substantial sum of money, the income from which was to be used for the maintenance of the property. On the death of his wife and daughter, the trust was directed to terminate and the property became subject to the power of appointment granted to Miss Walker.

The Selective Training and Service Act of 1940 (U. S. Code, tit. 50, Appendix, § 301 *et seq.*), as amended by the Service Extension Act of 1941 (U. S. Code, tit. 50, Appendix, § 351 *et seq.*), provides that where a person leaves his employment to enter military service and is qualified to perform the duties of his employment at the end of such service, the " employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so ". (Act of 1940, § 8, subd. [b], par. [B]; Act of 1941, § 7; U. S. Code, tit. 50, Appendix, § 308, subd. [b], par. [B], § 357.) Any person who is thus restored to a position " shall be considered as having been on furlough or leave of absence during his period of active military service ". (Act of 1940, § 8, subd. [d]; U. S. Code, tit. 50, Appendix, § 308, subd. [d].) It was stated in *Kay* v. *General Cable Corporation* (144 F. 2d 653, 654): " Every consideration of fairness and justice makes it imperative that the Statute should be construed as liberally as possible so that military service should entail no greater setback in the private pursuit or career of the returning soldier than is unavoidable."

The Commonwealth of Massachusetts, where the objectant was employed, enacted statutes to facilitate the re-employment of veterans. Under the terms of the statute an honorably discharged service man has the right to request the services of the Attorney-General and the Adjutant General of that State to take such legal and proper measures as might be necessary to enforce the reinstatement of the serviceman in his former employment. (Massachusetts Acts and Resolves, 1941, ch. 708. § 15.)

If Cordes had been discharged from military service immediately prior to Miss Walker's death, he could have compelled the trustees to reinstate him in his former position. He would be regarded insofar as his seniority, status and rights were concerned as an employee who had been given a leave of absence.

The Surrogate accordingly holds that Cordes was " in the employ " of the trustees at the time of Miss Walker's death. The relationship of employer and employee had not been terminated by his induction into the United States Army. (*Matter of Thompson,* 126 Misc. 91; *In re Cole,* [1919] 1 Ch. 218; *Hovey* v. *Grier,* 324 Mo. 634; Selective Training and Service Act of 1940; U. S. Code, tit. 50, Appendix, § 301 *et seq.*) All the contrary contentions of those opposed to the recognition of Cordes as a legatee are overruled.

We are further required to fix the exact amount to be paid to the personal representative of Cordes. In his objections Cordes claimed that his legacy was based upon the weekly rate paid to him for a full year. He was paid at the rate of $23 a week. If he had worked for a full year prior to the death of the donee he would have received $1,196. Under this theory he would be entitled to that sum and to an additional sum equal to ten times that sum. The total amount of the legacy under this theory would be $13,156.

In fact, however, Cordes did not receive any compensation between August 21, 1942, the date of his induction and December 17, 1942, the date of the donee's death. During the year immediately preceding the death of the donee, he had actually been paid the sum of $813. Under the terms of Miss Walker's will he is bequeathed " a sum of money equal to the amount of compensation so received by such employee from such * * * trustees, during the year immediately preceding my death ". This provision clearly limited a beneficiary to the amount he actually received from the trust estate in the fifty-two weeks immediately preceding Miss Walker's death. He was accordingly entitled to receive the foregoing sum of $813, his last annual compensation, and an additional sum of $8,130 for the specified period of ten years. The administrator of his estate is, therefore, entitled to receive the total sum of $8,943.

(3) The objections filed by Mae P. Romano, as executrix of the estate of Frank Romano, are sustained. The Surrogate holds that Frank Romano was in the employment at the death of the donee and his estate is entitled to a legacy under the terms of the codicil.

It is conceded that Frank Romano was employed continuously at " Brookside " for a period of thirty years. In November, 1941, in the course of his duty as a gardener, he was injured in an occupational accident. He was physically unable to perform any duties for the trustees from the date of his injury up to the date of death of the donee. It is urged that he lost his status as an employee and as legatee.

After his injury, Mr. Romano received workmen's compensation payments from an insurer of the employer. The trustees paid him each week the difference between the workmen's compensation and his regular weekly salary. This practice was continued by the trustees up to August 22, 1942, when Romano was removed from the payroll by the superintendent in charge of " Brookside " without express direction or authority of the trustees. Thereafter no payments were made to him from the

[redacted]

estate. Mr. Romano continued to receive compensation payments up to April 21, 1943, which was approximately four months after Miss Walker's death on December 17, 1942.

The trustees concede that they never discharged Romano or gave any instructions for the termination of his employment. The question is whether the inability of Mr. Romano to perform services and his removal from the payroll by a subordinate of the trustees — the superintendent of the country estate — terminated his employment with the trustees so that at the time of Miss Walker's death he was no longer in their employ within the meaning of the will.

The inability of Romano to render services during the period of his injury did not result in a termination of his employment. (*Matter of Thompson,* 126 Misc. 91, 95, *supra; Matter of Hoe,* 176 Misc. 803, 805; *Matter of Mitchell,* 114 Misc. 370, 375; *In re Lawson,* [1914] 1 Ch. 682.)

The Surrogate accepts this concession of the trustees and holds independently upon the record that Romano was employed by them at the death of the donee.

The question of the amount of his legacy is further presented. Under the will it is to be based upon the actual compensation received by him from the trustees during the year immediately preceding Miss Walker's death. In computing the annual amount of his compensation, there is directed to be included the sums paid to him as compensation awards as well as the additional payments actually made to him by the trustees.

(A portion of the original decision of the Surrogate determining a question of subordinate importance is omitted because it is not of general interest.)

(4) A further question is presented as to whether a legacy to a charitable corporation which had been legally dissolved prior to the donee's death, had lapsed or whether, on the other hand, the legacy could be saved by the application of the cy pres doctrine.

In subdivision (f) of the tenth paragraph of the will, the donee gave one portion of the residue of the appointive property to American Child Health Association, a West Virginia corporation. It is conceded that this corporation voted to dissolve on August 13, 1935, and was formally dissolved pursuant to the laws of West Virginia. The donee died on December 17, 1942.

The Surrogate holds that the share of the residue of the appointive property bequeathed to American Child Health Association lapsed by reason of the dissolution of the corporation prior to the death of the donee. (*Wright* v. *Wright,* 225 N. Y. 329; *Matter of Walter,* 150 Misc. 512, 516; *Matter of O'Hanlon,* 147 Misc. 546.)

The named legatee had no legal existence at the time of the donee's death. The legacy could never vest or take effect, and legally and actually lapsed. The rule is settled that where a legacy has lapsed, the doctrine of cy pres cannot save the gift. (*Wright* v. *Wright, supra.*) No subsequent decision of the Court of Appeals has changed that rule.

Since the legacy which has failed was intended to be a disposition of part of the residue, it cannot augment the other shares passing under the residuary clause. (*Wright* v. *Wright, supra.*) It is accordingly payable under the will of the donor to the institution designated to take the property in the event of a default in the exercise of the power of appointment.

(Other directions included in the original decision of the Surrogate omitted because of their subordinate importance.)

Submit decree on notice construing the will and settling the account accordingly.