**LORD MFG. CO. v. NEMENZ et al.**

Civil Action No. 81.

District Court, W. D. Pennsylvania.

April 26, 1946.

Gifford, Graham, MacDonald & Illig, of Erie, Pa. (M. E. Graham, of Erie, Pa., of counsel), for plaintiff.

Marsh, Spaeder, Baur & Marsh, of Erie, Pa. (J. A. Spaeder, of Erie, Pa., of counsel), for defendants (non-veterans) and Lord Employees Ass'n.

Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., for defendants (veterans).

WALLACE S. GOURLEY, District Judge.

This is a suit for declaratory judgment, pursuant to the Federal Declaratory Judgment Act, 28 U.S.C.A. § 400, and the questions presented arise under Sections 8(a), 8(b), and 8(c) of the Selective Training and Service Act of 1940, as amended, 50 U.S.C.A.Appendix, § 308(a, b, c).

The plaintiff, Lord Manufacturing Company, is concerned merely with having its

rights, duties and responsibilities determined. It stands in a position of neutrality in so far as the claims of the various defendants are concerned. The plaintiff, in substance, is in the position of a stake holder, holding certain valuable property, namely jobs, and not knowing or being able to definitely decide who should be the recipients thereof.

The defendants in said action are former and present employees of the plaintiff company who will be referred to as veterans and non-veterans, and the Lord Employees Association is the duly authorized and certified bargaining representative for the employees of the plaintiff company.

All the defendants have entered their appearance herein, and admitted all the allegations of fact contained in the Complaint. There are two groups of defendants, one (those of non-military service and the Lord Employees Association) asserts that upon the facts which exist, the employees of non-military service are entitled to retain their present positions with the company on the basis of the seniority rights of said employees; the other group of defendants (those of military service) asserts that upon the agreed statement of facts, and under the provisions of the Selective Training and Service Act, 50 U.S.C.A.Appendix § 301 et seq., they are entitled to be re-employed by the plaintiff and, if necessary, to replace the defendant-employees of non-military service.

■ The conflicting claims of the two groups of employees and that of the bargaining agent with the plaintiff company creates such a controversy between the parties as to justify the Court assuming jurisdiction, and could not be construed under any circumstances as an advisory decree.

In a situation such as exists in the instant case, the Federal Declaratory Judgment Act, Judicial Code, Section 274d, together with the Federal Rules of Civil Procedure, more particularly Rule 57, afford the only possibility of relief. The employer is placed in a situation where it must adopt a policy of employment which either accepts the National Selective Act as nullifying the seniority provisions in the union contract, or a position which follows the policy that the union contract is not affected by the Selective Service Act.

If the employer follows the union contract and disregards the veterans' contention under the Selective Training and Service Act, the employer is immediately subject to a suit by the veteran employees for failing to comply with the provisions of the Act. If, however, the employer accepts the veterans' position and disregards the seniority provisions of the union contract, he is immediately threatened with a proceeding under the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., for an unfair labor practice in disregarding a provision of the contract.

It appears, therefore, that a very real and immediate controversy exists, and the present proceeding avoids the possibility of such litigation and permits all parties concerned or interested to have their claims adjudicated.

■ It definitely was the intention of the Federal Declaratory Judgment Act, and Rule 57 of the Federal Rules of Civil Procedure, that a matter of this nature would be governed thereby. It has further been held by the Supreme Court of the United States that "controversy" involved in a declaratory judgment must necessarily be of a justiciable nature and exclude the situation where an advisory decree is requested upon a hypothetical state of facts. Ashwander et al. v. Tennessee Valley Authority et al., 297 U.S. 288, 56 S. Ct. 466, 80 L.Ed. 688.

Prior to the entry of the United States into World War II, Lord Manufacturing Company was a growing concern, but employed only about 500 employees. In November, 1943, the number of employees had increased to 2,818, which is the maximum employment during the history of the Company. During the present reconversion period less than 650 employees are required. About 500 employees have entered the armed services during World War II and are now rapidly returning and applying for reemployment under the Selective Service Act. Therefore, at the present time, and for many months in the future,

the number of applicants for jobs will be greater than the jobs available.

From October 25, 1944, to September 19, 1945, the United States Navy operated the plant of Lord Manufacturing Company, during which time the employees of Lord Manufacturing Company continued to work at the plant; and when such operation ceased, the Navy terminated the employment of all such employees, who were in most cases promptly rehired by Lord Manufacturing Company as private operations were resumed. Regardless of this break in employment of all employees, all parties involved in this suit have regarded the employment by Lord Manufacturing Company as continuous, where the employee was promptly rehired by the Company.

In each of the actual and existing controversies hereinafter set forth, and in future similar controversies which will inevitably arise, due to continued return of former employees of the plaintiff who have been in the armed services, the fundamental question involved is whether the re-hiring of employees who have been in the armed services shall be on the basis of seniority, or on a basis of super-seniority, or veteran's preference under the Selective Service Act, as interpreted by the Director of Selective Service. Hereinafter, for the purpose of convenience and clarity of statement, former employees who have entered the armed services and have been honorably discharged therefrom and have made application for reinstatement in their former jobs within 90 days of discharge, are referred to as "Veterans," and those employees who have not entered the armed services are referred to as "Non-Veterans." Wherever the seniority of a veteran is referred to, said seniority includes full credit for the time spent in the armed services, with each day of armed service being equivalent to a day of employment by the plaintiff.

On July 22, 1943, the plaintiff entered into a certain collective bargaining agreement with the defendant, Lord Employees Association, which organization was certified by the National Labor Relations Board on May 25, 1943, as the bargaining agent for all production and maintenance employees of the Lord Manufacturing Company. Thereafter, this agreement was modified and extended from time to time by other written agreements, and, as so modified and extended, was in full force and effect at the times pertinent for our consideration.

It is unnecessary to recite at length the terms of these bargaining agreements, but it is sufficient for our purpose to note that they each provide in great detail for the principal of service seniority in all dealings between the employer and employees. The contract provides, among other things, as follows:

### "Article IX—Seniority

"Seniority shall be defined as meaning job security and continuous work preference for particular work as well as work shifts, so long as employment or work is available.

"(a) The application of seniority rules shall be by departments. A department is defined as meaning all work, regardless of its nature, performed or carried out under the employee's department head.

"(b) Job placements and promotions to a higher paying job, or granting preference for particular work will be based at all times on seniority, together with equal consideration being given to his Selective Service military status.

"(c) An employee may be 'farmed out' to another department without losing his or her seniority position in his or her original department, if the employee and the department heads affected, viz.: the foreman or the Company, be agreeable to such temporary transfer, provided, however, that in any event, such temporary transfer shall not exceed a duration of thirty (30) calendar days.

"(d) An employee shall cease to have seniority:

"(1) If he quits.

"(2) If he is discharged.

"(3) If he is absent from work without notice to the Company for five (5) consecutive days.

"(4) If after being laid off and subsequently notified to return to work, he does not, within five (5) days, indicate a will-

ingness to return to work, either by appearing in person or by communication with the Personnel Department of the Company by letter, wire or telephone and therein state that he will return to work at the time stipulated in said notification received from the Company, which time shall not be less than seven (7) days from the date of such notification by the Company.

"(5) If six (6) consecutive months elapse since he has last worked for the Company, except that if such period or longer of lapsed employment is due to depressed economic conditions resulting in unemployment, provided the employee reports in person to the Company within at least every six (6) month interval from the last reporting date, then and in such event, such lapse shall not affect the seniority rights of any employee upon his return to employment following resumption of productive or renewed working conditions.

"(6) If absence from employment for any period of time is due to any conscripted or voluntary enlisted service of the employee, in any of the armed forces of the United States for periods of training and/or participation in warfare, such absence shall in no way affect the seniority rating of such employee upon his return to employment at the end of such period of conscripted or voluntary enlisted service, provided, however, said employee reports for employment within forty (40) days (now extended by law to 90 days) after discharge from military service in accordance with terms of Selective Service Act.

"The Company may at its option select an employee for promotion to a supervisory or administrative position without regard to seniority rules. In such event, however, the Company agrees to inform the Association in writing of such action, and if such promotion shall be for a probationary period on a temporary trial, said probationary period shall not exceed ninety (90) days in any event.

"The Company agrees to furnish to the Association when requested a seniority list."

"Article XII—Lay-Offs and Rehiring

"Whenever the Company, due to conditions beyond its control, is compelled to reduce the working force, in whole or in part, the proposed plan of reduction or shut-down shall first be disclosed fully to the Bargaining Committee of the Association.

"Only after the work week for the employees in any one or more departments has been reduced to thirty-two (32) hours per week shall the Company undertake any partial or complete lay-off or shut-down in such department or departments.

"In the event of such partial or complete lay-off or shut-down, the same shall be effected according to the rules of seniority, with employees holding higher seniority rating and possessing proper qualifications for their job receiving first consideration among those retained in employment. Qualification for the job being interpreted as past experience and capability of performance on a particular job.

"At the time of rehiring either after lay-off or shut-down, the order of precedence in rehiring shall likewise be based on seniority rating of employees, with the employees holding higher seniority rating and possessing proper qualification for their jobs receiving first consideration among those rehired."

In September, 1945, in pursuance to authority delegated previously thereto by the President to the Director of Selective Service, the Selective Service System interpreted the provisions of the Selective Service Act and provided, inter alia, certain rights and privileges for an honorably discharged veteran. Under date of November 26, 1945, the defendant, Lord Employees Association, notified the Lord Manufacturing Company that said Association representing the employees would not be bound by said interpretations, and would consider their contract broken with said company if the interpretations were acknowledged or recognized by the Company.

It, therefore, becomes necessary in the first instance to refer to the provisions of Section 8(b) and 8(c) of the Selective

Training and Service Act of 1940, as amended:

"8(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, other than a temporary position, in the employ of any employer and who (1) receives such certificate, (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within ninety days after he is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

"(A) if such position was in the employ of the United States Government, its Territories or possessions, or the District of Columbia, such person shall be restored to such position or to a position of like seniority, status, and pay;

"(B) if such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so."

"8(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration."

The Director of Selective Service, in his interpretation of the rights and privileges provided by the Selective Service Act, contended, inter alia, as follows:

"(a) A qualified person is entitled by law to reinstatement in his former position or to a position of like seniority, status, and pay:

"(1) If such position was in the employ of a private employer, the United States Government, its territories or possessions, or the District of Columbia;

"(2) If such position was other than a temporary position;

"(3) If he left such position in order to enter upon active military or naval service in the land or naval forces of the United States;

"(4) If he satisfactorily completed his period of training and service or period of active duty and received a certificate to that effect;

"(5) If he is still qualified to perform the duties of such position;

"(6) If he makes application for reemployment within 90 days after he is relieved from military training and service or from hospitalization continuing after discharge for a period of not more than 1 year; and

"(7) If such position was in the employ of a private employer, the employer's circumstances have not so changed as to make it impossible or unreasonable to reinstate the veteran to such position or to a position of like seniority, status, and pay.

"(b) In the event that a private employer's circumstances have so changed as to make it impossible or unreasonable for the employer to restore the veteran to his former position, the employer is obligated to restore the veteran to a position of like seniority, status, and pay, unless the employer's circumstances have so changed as to make such restoration also impossible or unreasonable. For purposes of the reemployment rights of veterans, a position of like seniority, status, and pay is construed to mean a position which, though not necessarily identical in every respect, is substantially equivalent to the veteran's former position on the basis of seniority, status, and pay.

"(c) The status which the law protects is 'a position other than a temporary position in the employ of any employer.' This expression covers almost every kind of relationship in which one person renders regular and continuous service to another. It unmistakably includes persons in superior positions and those whose services involve special skills, as well as ordinary laborers and mechanics.

"(d) The only positions not covered by the law are 'temporary' positions. By using the phrase 'position other than temporary' Congress evidenced an intention of using a broader concept than would have been entailed by use of the word 'permanent.' Hence, before a veteran is deprived of reemployment rights, it must be shown clearly that the employment he left to enter active military service was 'temporary.' In determining whether or not a position was 'temporary,' all of the facts and circumstances relating to the employment relationship must be considered. In all borderline cases the doubt as to whether the position left by the veteran was temporary should be resolved in favor of the veteran.

"(e) The fact that several veterans left the same job assignment in an employer's establishment to enter the armed forces is not determinative of whether the 'position in the employ of' the employer which any of such veterans left was temporary or other than temporary. It is the character of the employment relationship that should govern and not merely the particular assignment being carried out at the time of entry into active military service.

"(f) A veteran's right to employment for 1 year cannot be affected by the rights of other employees under private contracts or collective-bargaining agreements. In the case of partial shut-down, or lay-off, a veteran with the statutory right of 1 year's employment may not be laid off so long as the veteran's job or one of like seniority, status, and pay is available, subject only to the superior claims of other veteran employees. If the shut-down or lay-off is a complete one, the veteran is subject to lay-off the same as other employees.

"(g) The veteran's right of employment continues for 1 year after reinstatement and may not be terminated by temporary shut-down or·lay-off. Upon termination of a temporary shut-down or lay-off, within the 1-year period, a veteran has the same right of reinstatement that he had upon initially making application to be restored to his former position or a position of like seniority, status, and pay. The 1-year period during which a veteran may not be discharged without cause is not extended by temporary shut-downs or lay-offs and ends 1 year from the date of initial reinstatement.

"(h) A veteran is not subject to demotion to a position below the level of the position to which he has reinstatement rights during the period of 1 year following initial reinstatement and is entitled to be retained in his former position or one of like seniority, status, and pay during that period except that he may be demoted for reasons provided by the Director of Selective Service. However, it shall not be considered a demotion for the employer to place a veteran in a position of like seniority, status, and pay in order to comply with the provisions of Paragraphs f and g hereinabove set forth.

"(i) In addition to the right of reinstatement, seniority rights accumulate during the period of active military service. Upon reinstatement in his former position or in a position of like seniority, status, and pay, a veteran is entitled to have added to his length of service with the employer the total time spent in military service and to receive any additional benefits or advantages to which the total length of service, including the time spent in military service, entitles him.

"(j) A veteran, upon reinstatement, is entitled to any automatic pay increases which are given by the employer solely on the basis of length of service. When pay increases are conditioned upon considerations other than, or in addition to, length of service, the veteran's eligibility is to be determined under the established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time the veteran left to enter active military service. However, the time spent in military service must be added to the veteran's length of service when that is one of the considerations, regardless of whether or not such rules and practices of the employer provided that time spent on furlough or leave of absence may be so counted.

"(k) Where the wage rate which the veteran was receiving at the time he left his position to enter active military service was determined on the basis of individual merit or the relative skill and efficiency of the veteran, then the veteran is entitled

to receive the same wage upon reinstatement. If, however, the wage rate was not determined by individual ability but rather on the basis of a wage scale fixed for the job itself, which applied to all persons in that job regardless of relative skills and efficiency, then the veteran upon reinstatement is entitled to receive the current wage rate for the job in effect at the time of his return. This rule applies regardless of whether the current rate is higher or lower than it was at the time the veteran left to enter active military service."

There are nine different controversies presented in the Complaint in which the employer is confronted with the demand of two separate classes of persons (veteran employees and non-veteran employees) for the same positions of employment.

### Case No. 1—Kalista-Nemenz Controversy

Plaintiff presently, and for many months in the future, will require only eleven turret lathe operators in its machine shop, which is a separate department of the plaintiff's plant.

Defendant Matthew Kalista was hired by plaintiff April 18, 1934, has worked continuously for plaintiff since said date, and is now employed as a turret lathe operator, at $1.05 per hour.

Defendant Walter Nemenz was hired by plaintiff January 14, 1941; subsequently, when employed as a turret lathe operator, he entered the armed services, was thereafter honorably discharged, and made timely application for reinstatement as a turret lathe operator. Said Nemenz was reinstated as a turret lathe operator in accordance with the seniority provisions, but due to the later reinstatement of another honorably discharged veteran with greater seniority, has now been down-graded to a job as screw machine operator, at ninety-five cents (95¢) an hour. At the time of such down grading from turret lathe operator, there was no position of like seniority, status, and pay in plaintiff's plant.

Defendant Matthew Kalista contends that he is entitled to retain his position as turret lathe operator because of his greater seniority. Walter Nemenz contends that as an honorably discharged veteran, and under the reemployment provisions of the Selective Service Act, he is entitled to be reinstated in the job of turret lathe operator, regardless of the greater seniority of Matthew Kalista.

There are eight veterans, all of whom were former turret lathe operators employed by plaintiff when they entered the armed services, and all of whom have applied for reinstatement in such position. There are presently employed in plaintiff's plant eight non-veteran turret lathe operators with greater seniority than the said veterans. To reinstate Walter Nemenz in his job as turret lathe operator on the basis of his contention, and the similar reemployment of the seven other ex-servicemen similarly situated, will require the down-grading of Matthew Kalista to screw machine operator at 95¢ an hour.

### Case No. 2—Identical to Kalista-Nemenz Controversy

The following non-veteran employees, with the respective dates of their hiring and resultant commencement of continuous employment, are presently employed by plaintiff as turret lathe operators:

| Name | Date of Hiring |
| --- | --- |
| Peter Chiarizio | 3/17/39 |
| Thornton Vient | 11/24/39 |
| George Mills | 2/22/40 |
| Arthur Newsham | 7/25/40 |
| Charles Guthrie | 8/ 1/40 |
| Fred Travers | 10/15/40 |
| Emil Musolf | 10/24/40 |

The following employees, all being veterans, with the respective dates of their hiring and resultant commencement of continuous employment, have made timely application for reinstatement in their former jobs as turret lathe operators, and have not been thus reinstated because of greater seniority:

| Name | Date of Hiring |
| --- | --- |
| Byron Mills | 6/12/41 |
| Ernest Salzer | 8/ 6/41 |
| Bruce Kephart | 10/16/41 |
| Charles Shearer | 10/21/41 |
| Emil Forgash | 1/14/42 |
| Howard Stevens | 1/26/42 |
| William Fuhrer | 4/10/42 |

Each of the non-veteran employees enumerated above contends that he is entitled to retain his job as turret lathe operator because of his greater seniority. Each of the veteran employees enumerated above contends that under the re-employment provisions of the Selective Service Act, he is entitled to be reinstated in the job of turret lathe operator, regardless of the greater seniority of the non-veterans.

The reinstatement of the veterans enumerated above as turret lathe operators will require the respective displacement and down-grading of the non-veteran employees as follows:

Byron Mills will displace Peter Chiarizio.

Ernest Salzer will displace Thornton Vient.

Bruce Kephart will displace George Mills.

Charles Shearer will displace Arthur Newsham.

Emil Forgash will displace Charles Guthrie.

Howard Stevens will displace Fred Travers.

William Fuhrer will displace Emil Musolf.

### Case No. 3—Winchell-Lindquist Controversy

Defendant Gordon Winchell was employed by plaintiff on August 6, 1941, has been continuously employed since that date, and is at present employed as a screw machine operator at 95¢ an hour.

Defendant Al Lindquist was employed by plaintiff on October 23, 1941. Subsequently, while employed as a screw machine operator, he entered the armed services, was thereafter honorably discharged, and made timely application for reinstatement as a screw machine operator, and was reinstated in accordance with seniority provisions, but due to the later reinstatement of other veterans with greater seniority, he has been down-graded to drill press operator, at 90¢ an hour. At the time of such down-grading from screw machine operator, there was no position of like seniority, status, and pay in plaintiff's plant.

Gordon Winchell contends that he is entitled to retain his job as screw machine operator, because of his greater seniority. Al Lindquist contends that under the re-employment provisions of Selective Service Act, he is entitled to be reinstated in the job of screw machine operator, regardless of the greater seniority of Gordon Winchell.

To reinstate Al Lindquist as screw machine operator at 95¢ an hour will require the replacement of Gordon Winchell as screw machine operator, and his down-grading to wire brush operator at 90¢ an hour.

### Case No. 4—Ericksen-Miller Controversy

Plaintiff at present requires a maximum of approximately twenty-four press operators in the rubber department of its plant.

Defendant Floyd Miller was employed as a press operator by plaintiff February 26, 1942, has been thus continuously employed since then, and is now thus employed at 95¢ an hour.

Defendant Elwood Ericksen was employed by plaintiff as a press operator, February 10, 1943; subsequently, while thus employed, he entered the armed services, was later honorably discharged, and made timely application for reinstatement as a press operator, and was reinstated in accordance with the re-employment provisions of the Selective Service Act and its interpretation by Selective Service System. Since such reinstatement, lack of work for press operators requires that one press operator be laid off, which lay-off will take place within the next two weeks, it being the intention of plaintiff to lay off the Defendant Ericksen.

Defendant Ericksen contends that under the Selective Service Act he is entitled to be retained as press operator and that, once reinstated under the provisions of Selective Service Act, he is entitled to be protected against lay-off for one year. Said defendant Miller contends that under his greater seniority, he is entitled to be retained as press operator.

In addition to Ericksen, there are three other veterans who were employed by plaintiff as press operators when they en-

tered the armed services. These veterans have been honorably discharged from the service, have made timely application for reinstatement, and have not been reinstated because their seniority is less than the respective seniorities of non-veteran employees. The retention of defendant Ericksen and the lay-off of one non-veteran and the reinstatement of the three veterans similarly situated would require the down-grading or lay-off of defendant Miller, whose seniority is greater than the seniority of any of the veterans who would thus be employed as press operators.

### Case No. 5—Identical to the Erick-sen-Miller Controversy

The following employees, not veterans, with the respective dates of their hiring and resultant commencement of continuous employment, are at present employed by the plaintiff as press operators:

| Name | Date of Hiring |
|---|---|
| Ray Buseck | 3/ 5/42 |
| Frank Mancuso | 5/21/42 |
| Darrell Sourwine | 8/24/42 |

The following employees, all veterans, with respective dates of their hiring and resultant commencement of continuous employment until their entry into the armed services, have made timely application for reinstatement in their former jobs as press operators, and have not been thus reinstated on account of the greater seniority of the non-veterans named above:

| Name | Date of Hiring |
|---|---|
| William Weller | 8/24/42 |
| Elmer Fogelboch | 9/ 2/43 |
| Edward C. Hess | 4/ 4/45 |

Each of the non-veteran employees enumerated above contends that he is entitled to retain his job as press operator because of his greater seniority. Each of the veteran employees enumerated above contends that under the re-employment provisions of the Selective Service Act he is entitled to be reinstated in the job of press operator, regardless of the greater seniority of the non-veterans.

The reinstatement of the veterans enumerated above as press operators will require the respective displacement and down-grading of the non-veteran employees as follows:

William Weller will displace Ray Buseck.

Elmer Fogelboch will displace Frank Mancuso.

Edward C. Hess will displace Darrell Sourwine.

### Case No. 6—McLaughlin-Smith Controversy

Defendant William McLaughlin was employed as a metal processor by the plaintiff, December 10, 1940, and has thus been continuously employed since then, and is now thus employed at 90¢ per hour.

Defendant Gorman O. Smith was employed by plaintiff as a metal processor, September 16, 1942, subsequently, while thus employed, he entered the armed services, was later honorably discharged, and made timely application for reinstatement as metal processor. Said Smith was not rehired as metal processor because of lack of seniority.

At the time of the application of said Smith for reinstatement as metal processor, the said William McLaughlin had the least seniority of any metal processor employed by the plaintiff, and the hiring of the defendant Smith would have required the displacement of William McLaughlin.

At the time of the application of defendant. Smith for reinstatement as metal processor, there was no job of like seniority, status, and pay in the plaintiff's plant.

Defendant Smith contends that he is entitled to be rehired under the provisions of the Selective Service Act, regardless of the greater seniority of defendant McLaughlin. Defendant McLaughlin contends that he is entitled to be retained as metal processor because of his greater seniority.

### Case No. 7—Forish-Schlosser Controversy

Defendant George Forish was employed as a metal processor by the plaintiff, February 18, 1942, and has thus been continuously employed since then, and is now thus employed at 90¢ an hour.

Defendant Norman A. Schlosser was employed by plaintiff as a metal processor on March 3, 1943, such hiring being due to war expansion of plaintiff's plant, subsequently, while thus employed, he entered the armed services, was later honorably discharged, and made timely application for reinstatement as metal processor. Said Schlosser was not rehired as metal processor because of lack of seniority.

At the time of the application of said Schlosser for reinstatement as metal processor, the said George Forish had the least seniority of any metal processor employed by plaintiff, and the hiring of the defendant Schlosser would have required the displacement of George Forish.

At the time of the application of said Schlosser for reinstatement as metal processor, there was no job of like seniority, status, and pay in the plaintiff's plant.

Defendant Schlosser contends that he is entitled to be rehired under the provisions of the Selective Service Act, regardless of the greater seniority of defendant Forish. Defendant Forish contends that he is entitled to be retained as metal processor because of his greater seniority, and further contends that the hiring of Norman A. Schlosser, due to war expansion, was a hiring in a temporary and not in a permanent job.

### Case No. 8—Krahe-Tallman Controversy

Defendant Regis Krahe was employed as a finisher by the plaintiff, May 15, 1942, and has thus been continuously employed since then, and is now thus employed.

Defendant Earl Tallman was employed by plaintiff as a finisher on May 13, 1943, subsequently, while thus employed, he entered the armed services, was later honorably discharged, and made timely application for reinstatement as finisher. Said Tallman was not rehired as finisher because of insufficient seniority.

At the time of the application of said Tallman for reinstatement as finisher, to have reinstated Tallman would have required the displacement of Krahe, who had greater seniority.

At the time of the application of said Tallman for reinstatement as finisher, there was no job of like seniority, status, and pay available in plaintiff's plant.

Defendant Krahe contends that he is entitled to be retained as finisher because of his greater seniority. Defendant Tallman contends that he is entitled to be rehired under the provisions of the Selective Service Act, regardless of the greater seniority of defendant Krahe under the contract.

### Case No. 9—Dunbar-Hlavenka Controversy

Henry Dunbar was employed by plaintiff on August 31, 1942, as a metal processor, and has since worked continuously at said employment

Defendant John Hlavenka was employed by plaintiff as a metal processor on November 20, 1942, in place of a metal processor previously employed who had entered the armed service; subsequently said Hlavenka entered the armed service, later was honorably discharged, and made timely application for reinstatement in his job as metal processor. Said Hlavenka was not rehired as metal processor because of lack of seniority

At the time of the application of said Hlavenka for reinstatement as metal processor, his rehiring would have required the displacement of defendant Dunbar.

At the time of the application of defendant Hlavenka for reinstatement as metal processor, there was no job of like seniority, status, and pay in the plaintiff's plant.

Defendant Hlavenka contends that he is entitled to be rehired under the provisions of the Selective Service Act, regardless of the greater seniority of defendant Dunbar. Defendant Dunbar contends that he is entitled to be retained as metal processor because of his greater seniority, and further contends that the original hiring of Hlavenka in place of an employee who had entered the armed services was a temporary and not a permanent hiring.

It must be primarily kept in mind that prior to the entry of the United States in World War II, the plaintiff company was a growing concern by only a complement

of about 500 employees. As a result of the possibility of war and with the subsequent attack on Pearl Harbor, the employees of said company in November of 1943, had increased to 2818, which was the maximum employment during the history of the company. This substantial increase in the employment was caused by the advent of war and the fact that the company was engaged in the manufacture of materials used by the naval forces. In fact, during the period from October 25, 1944 to September 19, 1945, the United States Navy operated the plant of the plaintiff company. After the cessation of hostilities and the security of this country was made definite, the company found it necessary to substantially reduce its personnel, and at the present time there are only approximately 650 employees required. After the enactment of the Selective Training and Service Act, and subsequent to the entry of the United States into World War II, approximately 500 employees of the plaintiff company entered the armed services of this country. A situation, therefore, exists where the number of applicants for employment greatly exceeds the number of jobs which are available. The company's normal peace time complement of approximately 650 trained employees may, therefore, have to be largely, if not wholly, displaced by those coming to the plant during the war years if any large percentage of those entering military service return, demand employment, and are held to have employment rights superior to the older employees. Although it is not stated in the pleadings, it is a reasonable inference that a very large percentage of those leaving the plant to enter military service came from among those between the ages of 18 and 35 generally, and in some instances between the ages of 35 and 45. This is true for the reason that the older employees, many of whom had been employed by the defendant company for a number of years, obviously would not be of military age.

Indeed the principle of absolute priority for the veteran, as contended for by the Director of Selective Service, if carried to its logical conclusion, means that if sufficient veterans return to man the plant all (assuming qualifications) must be employed and all non-veterans discharged. In other words, carried to a logical, but perhaps not altogether a reasonable conclusion, those persons employed during the war inflation era and later entering military service may now take over the operation of the plant and those of long years of service and training in the plant may be displaced.

It cannot be denied but that the Act in question has given the returning soldier some very well defined rights. If he has left a position other than a temporary one and at the conclusion of his military service merits and receives an honorable discharge, he is still qualified to perform the duties of his former position and makes application for reemployment within the time provided, he is entitled under certain conditions to be reemployed. If his employer was a private employer, it becomes the duty of the employer to restore such person to such position or one of like seniority, status and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so.

Standard dictionaries define "permanency" as a thing that is lasting, that which is not temporary. The same authorities define "temporary" as "transient or passing—not permanent; existing or continuing for a limited time only." It could not reasonably have been within the contemplation of either employer or employee (unless it be an exceptional case) that those who came to the plant on account of increased war production would long remain after the demands of war had been met. Many, no doubt, were moved by patriotic motives to be of service to their country in its time of need—some may have been moved by the desire to avoid military service—but whatever the motive, the fact remains that they were there to meet an immediate and urgent demand that all fervently hoped would be of short duration.

Subsection (B) of 308(b) is the operative source of the privilege on which the plaintiff relies; it reads as follows: "Such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the em-

ployer's circumstances have so changed as to make it impossible or unreasonable to do so." "Such position" is nowhere defined except as "a position, other than a temporary position, in the employ of any employer." Taking this clause by itself, it seems to me beyond debate that it was not intended that the veteran should gain in seniority. It will be observed that the grant is in the alternative: he is to be "restored" to his original position, or to one of "like seniority, status, and pay," whenever possible. The phrase "like seniority" means the "same seniority" as before; and it necessarily precludes any gain in seniority. It follows that, if the original position is no longer open, the substitute shall be a position of no greater, though no less, seniority than the lost position. But if that be true, there can be no implication that, if the original position be not lost, but be still available, the veteran shall be restored to it with a gain in priority; for that would presuppose that Congress did not intend the substitute to be as nearly a complete substitute for the lost original as it was possible to make it, a hypothesis absurd on its face. Hence, we must start with the proposition that subsection (B) of 308(b) not only did not grant any step up in seniority, but positively denied any.

Subdivision (c) confirms the intention so disclosed. As subsection (B) reads, it would probably be understood to restore the veteran only to that same position which he held when he was inducted. That was, however, thought to be unfair; for while he was in the service, there were likely to be such changes in the personnel that when he came back, he might find himself junior to those over whom he had had priority when he left. To remedy this, by an amendment made while the bill was in Congress, he was given the same status that he would have had, if he had been "on furlough or leave of absence" while he was in the service. How far that differed from his position, had he remained actively at work, does not appear; but clearly the amendment presupposed that a difference there might be. Having in this way declared how the veteran's interim position "shall be considered", Congress

added that he should be "restored without loss of seniority." Had the purpose been, not only to insure the veteran that he should not lose any more steps upon the ladder than if he had been on leave, but also that he should go to the top, we cannot conceive that Congress would have expressed itself in the words, "without loss of seniority." They have no such express meaning, and their implications are directly the opposite; for they disclose a concern against his possible demotion inconsistent with any implied belief in his promotion. For these reasons I am satisfied that, except for the concluding phrase of subdivision (c) there can be no doubt that textually the union's construction is the right one. It remains to consider that phrase which, as I understand it, is the chief reliance of those who take the opposite view.

It declares that the veteran "shall not be discharged from such position without cause within one year after such restoration"; and we should, so far as possible, interpret it so as not to conflict with the rest of the section; in particular, so as to leave untouched the privilege of seniority, as it is earlier defined. There is no difficulty in doing so, if "discharge" means a permanent end to the relation of employment, a separation, a dismissal; and that is indeed its ordinary meaning. For example, the Oxford Dictionary (Vol. II, p. 412, subtitle "Discharge" 1, 3), reads: "To relieve of a charge or office; (more usually) to dismiss from office, service or employment; to cashier:" this in distinction with "Lay-off" (Supplement, p. 8): "A period during which a workman is temporarily dismissed or allowed to leave his work; that part or season of the year during which activity in a particular business or game is partly or completely suspended; an off-season." It seems to me that Congress used "discharge" in this sense: i.e., that the veteran was to be assured of his job for the same period—a year—for which he was to be drafted; but that the job to which he was "restored"— as that very word implies—was to be subject to the same conditions to which the old job had been subject, with only the exception that it should be better in so far

as a leave of absence for the year might improve it. The value of that assurance would indeed vary. In a closed shop it would presumably add little, for the union would not allow a member to be discharged without cause anyway. In an open shop the same would be true, if it were partly unionized, and the veteran were in the union; but, whenever for any reason he had not that protection, it prevented his being turned out, so long as he behaved himself, and that was an advantage of no mean importance. We do not know what proportion of those in industry are not in unions; but their number is certainly very large, and, even though the clause was of value only to them, they are numerous enough to give it a purpose; to say nothing of the possibility that statutory protection may be an important supplement to union protection.

When we consider the situation at the time that the Act was passed—September, 1940—it is extremely improbable that Congress should have meant to grant any broader privilege than as we are measuring it. It is true that the nation had become deeply disturbed at its defenseless position, and had begun to make ready; but it was not at war, and the issue still hung in the balance whether it ever would be at war. If we carry ourselves back to that summer and autumn, we shall recall that the presidential campaigns of both parties avoided commitment upon that question, and that each candidate particularly insisted that no troops should be sent overseas. The original act limited service to one year, and it was most improbable that within that time we should be called upon to fight upon our own soil; as indeed the event proved, for we were still at peace in September, 1941. Congress was calling young men to the colors to give them an adequate preparation for our defense, but with no forecast of the appalling experiences which they were later to undergo. Against that background it is not likely that a proposal would then have been accepted which gave industrial priority, regardless of their length of employment, to unmarried men—for the most part under thirty—over men in the thirties, forties or fifties, who had wives and children dependent upon them.

Today, in the light of what has happened, the privilege then granted may appear an altogether inadequate equivalent for their services; but we have not to decide what is now proper; we are to reconstruct, as best we may, what was the purpose of Congress when it used the words in which 308(b) and 308(c) were cast.

The plaintiff argues, however, that, regardless of their original scope, these sections have in any event by administrative interpretation and by later legislation, taken on the meaning which they claim. I shall consider first the administrative interpretations. Section 8(g) directs the Director of Selective Service to establish a "Personnel Division" which shall "render aid in the replacement in their former positions of, or in securing positions for * * * persons who have satisfactorily completed any period of their training and service under this Act," and on March 5, 1944, the Director issued a memorandum (No. 190-A, Part IV, Paragraph 4(b), which read: "A veteran who has been reinstated to his former position cannot be displaced by another on the ground that the latter has greater seniority rights." Section 8(e) directs the proper district attorney, "if reasonably satisfied" that a veteran "is entitled" to the benefits of the Act, to "appear and act as attorney" for him to enforce his rights; and the Attorney General, as appears from his intervention as amicus in this action, has read the law like the Director of Selective Service. On the other hand, the National War Labor Board adopted the opposite view in Re Scovill Manufacturing Co., 21 W.L.R. 200; as have several of its arbitrators; and the Solicitor of the Department of Labor did the same in an instruction for the guidance of federal conciliators in dealing with war veterans. 16 L.R.R. 481.

There remains the question whether the amendment of Section 8(d) of the Selective Training and Service Act on December 8, 1944, and the extension of the whole Act until May 15, 1946, is to be taken as embodying the position of the Director of Selective Service. The amendment, taken alone, only extended the time within which a veteran might apply for

reinstatement from 40 days to 90 days, or from hospitalization continuing after discharge for a period of not more than one year. In addition thereto, the National Labor Relations Board and the Solicitor of the Labor Department had both made rulings prior to the enactment of Amendment 8(c), which were exactly opposite to the rulings of the Director of Selective Service. The interpretation, therefore, of said amendment would be extremely hazardous if it was imputed to Congress that knowledge existed of all administrative rulings, or to suppose that Congress was familiar with one set of rulings and not with the other. It would, therefore, be purely conjectural to suppose that Congress considered one or all of the various administrative rulings at the time of the re-enactment of Section 8(b). It is difficult to foresee how such a vital change in industrial relations would have been made without notice to those who had an interest equal with the veterans themselves—organized labor, non-veteran employees, members of World War I, and the labor field generally. It is furthermore not reasonable to believe from the standpoint of general morale in any company, and from the standpoint of cooperative relations between the employer and employee in the case where one employee has been trained and acquired his skill under the supervision and tutelage of another employee, to have the pupil return and oust the teacher for no inherent reason attributable to either. This is especially true without the reason of unskillfulness or unfaithfulness on the part of the teacher, or of greater skillfulness and greater faithfulness on the part of the pupil.

■■■ If an employer is compelled under a curtailed production program, in which sufficient jobs are not available for all who were formerly employed, to violate his collective bargaining agreement with his employees and disrupt the general morale of its organization, such an occurrence would be disastrous, unreasonable and exceedingly dangerous in the industrial field. It is true that if the bargaining agreement clashes with the provisions of the Selective Service Act, then the former must yield, but the questions here presented

whether or not an interpretation of the provisions of the Selective Service Act would have application to the matters at issue are in direct conflict. It does not appear to me reasonable that Congress intended that by reason of an employee's military service, such occasion was to be a means by which one workman was to gain an advantage over another workman but the intention of Congress was to place the employee who entered military service in a position where he would keep his "status quo" and be not penalized by reason of such military service. Every consideration of fairness and justice makes it imperative that the statute should be construed as liberally as possible so that military service should entail no greater setback in the private pursuit or career of the returning soldier than is unavoidable. Kay v. General Cable Corporation, 3 Cir., 144 F.2d 653.

■■ A person who entered military service shall be considered as having been on furlough or leave of absence during his period of active military service, and should be credited while in military service on the same basis as if he were actually employed during his term of service. In re Walker's Estate, 185 Misc. 1046, 53 N.Y.S.2d 106, at page 113; Grasso v. Crowhurst et al., 3 Cir., 154 F.2d 208. (This case is not recorded at this date for legal reference).

The principle of seniority among workmen in industrial plants has long been the cornerstone of harmonious relations between employer and employee, and today has become generally accepted by both capital and labor. We should not lightly attribute to Congress the intention of overthrowing and disrupting this relationship in the absence of language clearly evidencing such intent. The Act itself recognizes the principle. In Section 8(c) it is provided that a person who is restored to his position "shall be considered as having been on furlough or leave of absence during his period of active military service, shall be so restored without loss of seniority." It is now urged that he is to be restored not only "without loss of seniority" but with a distinct advance in seniority over those of

long years of service in the plant. All parties agree that under the Act the veteran has accumulated seniority the same as if he had remained on his job and so far as actual seniority is concerned bears the same relative position to all other workmen who remained at their post. To hold that the veteran has also gained the right to advance over older employees far beyond his years of service, including his period of military service, would be to give him an undue advantage over other workmen. While Congress has in numerous ways accorded the veteran benefits and advantages due to his military service they have on the whole been at the expense of a grateful people and not at the expense of a class—in this instance the older employees if the interpretation of the Director be adopted. To hold that Congress was intending by this Act to confer such an advantage on the serviceman, in my judgment, goes beyond the express provisions of the Act and would not be warranted under ordinary rules of construction. Congress by a later Act, World War II Servicemen's Readjustment Benefits, G.I. Bill of Rights, 38 U.S.C.A. § 693 et seq., conferred advantages on the serviceman far beyond the civilian. By the Selective Training and Service Act, however, they were undertaking to establish the machinery for a "fair and just system of selective compulsory military training and service" and to that end provided in Section 8 of the Act that no handicaps should be placed on one in his employer-employee relationship by reason of his leaving his employment for military service. His status quo with accumulated seniority was provided for and definitely preserved; he was to suffer no handicaps in his employment relation by reason of his military service; in short, he was to get his own job back if it was in existence—not to get the job of another with longer years of service. A different construction would most certainly create such an unrest and upheaval in industrial relations as would retard economic recovery and be of no lasting benefit to anyone, including the veteran. The argument goes that it was thus the intention of Congress to give the returning veteran an advantage over his former fellow workmen and that such advantage is no more than a just reward for a patriotic service nobly performed. Without minimizing the great respect and lasting obligation, all are under to those who bore the brunt of military service, yet we are not to be carried away in this hour of triumph, and in our zeal to show our appreciation to the returning veteran perforce be led into a construction of the Act that holds such potentialities of chaos in industrial relations. Such a construction of the Act can in no sense be squared with ordinary justice and fair play, and I cannot believe that Congress so intended. In the Congressional debates one of the sponsors of the bill said: "It seems to me we could not require a company to restore the employment of men who, if there had been no military service, might have been discharged during the year because of a necessary reduction of the company's force."

There is definitely a decided conflict of authority existing in the various District Courts in connection with the interpretation of the Act, and there appears to be only one decision directly on the point at issue in the Circuit Court of Appeals. In connection with the proceeding decided in the Circuit Court of Appeals, which was a two to one decision, it is the information of the Court that the Supreme Court of the United States has agreed to review said decision in view of the importance of the question involved. It, therefore, appears that regardless of the opinion rendered by this Court, the decision of the Supreme Court of the United States will definitely govern the facts at issue. However, all parties concerned in this judicial district are desirous of having the issue adjudicated at the earliest possible date, and I, therefore, feel that it is the duty of this Court to render and file my decision at the earliest possible date.

It certainly was the intention of the law to assure the veteran that he would be given his own job after his discharge from military service, not that he would be given the job of some other employee. I do not believe it was intended that the veteran could walk into the plant of his former employment, and the worker who

had been there for years before would have to walk out. The result would be to put the burden of the re-employing of veterans on those least able to carry it, the individual workers—not Government or industry.

It is a known fact that when a workman reaches the age of 45 it is extremely difficult, during normal times when said person is out of employment, to secure work in the industrial field generally due to the age of said person unless some person of influence or position sees fit to intercede in behalf of said person. In other words, the older workman with a family and dependents would be placed in a position where the veteran, who is a younger man, would displace him in his employment and create conditions which would revolutionize the practice and custom which has been followed by labor and industry in our American way of life. I do not believe any veteran desires to place himself in the classification of a favored few, when we consider that in this democracy there are 140 million people. One of the reasons for which World War II was fought was for the preservation of this democracy, and a free and equal opportunity to all of the continuation of the right of life, liberty and pursuit of happiness; that each person in this democracy was to have the same opportunities, rights and privileges, regardless of race, color or creed. I believe that it would be most unfair to place the majority of the workmen in the position where they would suffer by the loss of their employment through special privileges or rights being extended to veterans of World War II.

I hope that my decision might not be taken as indicating any indifference to the claims of those who stood by the nation in the hour of its need in the hazard, and so often with the loss of all that life holds dear.

The Act provides, inter alia, that the veteran shall be restored to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so. This was intended to provide for cases where necessary reduction of an employer's operating force or discontinuance of some particular department or activity would mean simply creating a useless job in order to re-employ the former employee. Kay v. General Cable Corporation, 3 Cir., 144 F.2d 653.

Since approximately 2800 men were employed by the plaintiff company during the war, and at the present time its complement only requires 650 men, it appears to me that this is a case where there has been a necessary reduction of an employer's operating force through no fault of the employer but due to general economic conditions as a result of the end of the war and the cessation of hostilities.

Congress has provided for unemployment compensation insurance benefits for honorably discharged veterans where a veteran was unable to secure employment. 38 U.S.C.A. § 696 et seq. Benefits were made available on the basis of $20.00 per week for a period of fifty-two (52) weeks where employment could not be secured. I believe that if it was the intention of Congress to have a veteran replace a nonveteran with greater seniority rights, Congress would have provided in the legislation just referred to that the provisions of said Act had application only to veterans under the following circumstances:

(a) A veteran honorably discharged from service who had no employment at the time of his induction or enlistment for military service in World War II.

(b) A veteran honorably discharged from service who was employed at the time of his induction or enlistment, and where at the time of his discharge the employer of the veteran was no longer engaged in business.

(c) A veteran honorably discharged from service who was employed at the time of his induction or enlistment where after the granting of super-seniority rights to veterans formerly employed, no work or position remained available for the additional employees who entered military service as a result of all jobs having been filled by employees in military service.

Furthermore, the policy of a special re-employment right for veterans is incom-

patible with the welfare of labor generally and job security, with management's interest in minimizing dislocations through sound personnel practice, and with the general public interest in an orderly transition to a peace economy.

It must be remembered that many patriotic workers were not permitted to enter the military service during World War II for the reason that the Government, through its designated agencies, believed that their services in the field of production were most important to the successful prosecution of the war effort. It, therefore, does not appear reasonable to believe that Congress intended to penalize those essential employees, who toiled and worked on the home front, by reducing their seniority status in such a manner that their employment would cease at the time of the discharge of the former employees who entered military service. It is so well known and realized that without the services of the essential employees in production, it would have been impossible to carry the war through to a successful conclusion. I furthermore do not believe that Congress ever intended that veterans of World War I, who also made many sacrifices for the defense of this country during said War, should be placed in a position where they would lose their employment in being replaced by a veteran of World War II.

I, therefore, find that Congress intended as follows:

(a) That the man who was called to military service should not be prejudiced in any way when he was honorably discharged from service in the matter of his employment or occupation.

(b) That a person honorably discharged from military status maintained his seniority status with his employer, and said seniority status should not in any way be impaired by military service, or that a per- · son who entered military service shall be considered as having been on furlough or leave of absence during his period of military service.

(c) That a person who entered military service should be credited while in military service on the same basis as if he were actually employed during his term of service.

(d) That a person in military service would not gain or secure a super-seniority status which would entitle said person, who was honorably discharged, to replace employees of greater seniority with their employer.

Counsel may submit proposed findings of fact and conclusions of law, and decree in accordance with this Opinion.